Williams, Judge,
delivered the opinion of the court:
The Choctaw Nation of Indians brings this suit under the authority of the Special Jurisdictional Act of June 7, 1924, 43 Stat. 537. Section 1 of the act provides:
That jurisdiction be, and is hereby, conferred upon the Court of Claims, notwithstanding the lapse of time or statutes of limitation, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Choctaw and Chickasaw Indian Nations or Tribes, or either of them, or arising under or growing out of any act of Congress in relation to Indian affairs which said Choctaw and Chickasaw Nations or Tribes may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.
Section 6 of the Act provides:
The Court of Claims shall have full authority by proper orders and process to bring in and make parties to such suit any or all persons deemed by it necessary or proper to the final determination of the matters in controversy.
Upon motion of the Assistant' Attorney General the Chickasaw Nation of Indians, on January 5,1935, was made party defendant by order of the court, and the case comes *146 on for trial with the Choctaw Nation party plaintiff, and the United States and the Chickasaw Nation parties defendant.
During the period from June 28, 1898 to July 1, 1929, the United States collected the sum of $34,470,650.27 in connection with the disposition and management of the common lands and property of the Choctaw and Chickasaw Nations. These moneys, with few exceptions, were brought into the Treasury of the United States and credited on the books of the defendant, in the proportion of three-fourths to the Choctaw Nation and one-fourth to the Chickasaw Nation. The moneys credited to the Choctaw Nation were disbursed directly to members of that Nation on a per capita basis or were otherwise expended for their use and benefit, while the moneys credited to the Chickasaw Nation were likewise disbursed per capita to members of that tribe or otherwise distributed for their use and benefit.
The plaintiff Indians contend that the apportionment and payment of the moneys involved should have been made on the basis of the total membership of the two Nations, and not on the basis of three-fourths to the Choctaw Nation and one-fourth to the Chickasaw Nation, by which method of apportionment and payment of the moneys it is asserted that the Choctaws have received less, and the Chickasaws have received more, than they were respectively entitled to receive. It is contended that the correct basis for the apportionment and payment of the moneys was 76.14% to the Choctaws and 23.26% to the Chickasaws, that being the proportion the individual membership of the respective Nations bore to the combined membership of the two tribes as shown by the approved final membership rolls — 20,799 Choctaws, and 6,304 Chickasaws. In other words the plaintiff tribe contends that the moneys should have been disbursed on a per capita basis to the individual members of the Choctaw and Chickasaw Nations without reference to tribal enrollment.
The United States and the Chickasaw Nation contend that the basis for the apportionment and payment of the moneys, in the proportion of three-fourths to the Choctaws and one-fourth to the Chickasaws, was the proper and legal basis, so *147 fixed and agreed upon in various treaties between those Nations and the United States, and in numerous acts of Congress dealing directly with the apportionment and payment of such moneys. It is further contended that the apportionment and payment of the moneys involved, in the proportion of three-fourths to the Choctaws and one-fourth to the Chickasaws, has, in fact, resulted in all individual members of the two Nations receiving substantially equal shares.
Prior to 1830 the Choctaw Nation of Indians occupied lands east of the Mississippi River in the States- of Mississippi, Tennessee, and Alabama. On September 27, 1830, the Choctaw Nation and the United States entered into a treaty (7 Stat. 333) under the terms of which the Nation ceded to the United States all its lands east of the Mississippi River in exchange for certain lands located in what is now the State of Oklahoma, to which lands it soon thereafter moved.
The Chickasaw Nation prior to 1832 lived east of the Mississippi River and occupied lands in the States of Tennessee and Mississippi. In October 1832 that Nation and the United States entered into a treaty under the terms of which the Chickasaw Nation sold and ceded all its lands east of the Mississippi to the United States and agreed to remove therefrom to such territory west of the Mississippi River as should later be determined upon. The United States agreed to sell the lands so ceded, as soon as it could “conveniently be done”, the proceeds thereof to go to the Chickasaw Nation under the terms stipulated in the treaty. . On January 17, 1837, the Choctaw Nation and the Chickasaw Nation made and entered into a treaty (11 Stat. 573) under the terms of which the Chickasaw Nation, for a consideration of $530,000, bought an interest in the lands in Indian Territory occupied by the Choctaw Nation. Article I of this treaty reads:
It is agreed by the Choctaws that the Chickasaws shall have the privilege of forming a district within the limits of their country, to be held on the same terms that the Choctaws now hold it, except the right of disposing of it, which' is held in common with the Choctaws and Chickasaws, to be called the Chickasaw dis *148 trict of the Choctaw Nation, to have an equal representation in their General Council, and to be placed on an equal footing in every other respect with any of the other districts of said nation, except a voice in the management of the consideration which is given for these rights and privileges; and the Chickasaw people to be entitled to all the rights and privileges. of Choctaws, with the exception of participating in the Choctaw annuities, and the consideration to be paid for these rights and privileges, and to be subject to the same laws to which the Choctaws are; but the Chickasaws reserve to themselves the sole right and privilege of controlling and managing the residue of their funds, as far as is consistent with the late treaty between the said people and the Government of the United States, and of making such regulations and electing such officers for that purpose as they may think proper.
Article V of the treaty reads:
It is hereby declared to be the intention of the parties hereto, that equal rights and privileges shall pertain to both Choctaws and Chickasaws to settle in whatever district they may think proper, and to be eligible to all the different offices of the Choctaw Nation, and to vote on the same terms in whatever district they may settle,, except that the Choctaws are not to vote in any wise for officers in relation to the residue of the Chickasaw fund.
This treaty pursuant to its terms was approved by the President and the Senate of the United States. After the Chickasaw Indians had moved into the Choctaw country differences arose between the two tribes concerning the boundaries of the Chickasaw district. To compose these disputes a new treaty was entered into between them on November 4, 1854 (10 Stat. 1116), in which the boundaries of the Chickasaw district were again determined and fixed, the treaty of January 17, 1837, remaining otherwise unchanged. This supplemental treaty was also assented to by the United States.
The United States and the Choctaw and Chickasaw Nations entered into a treaty on June 22, 1855 (11 Stat. 611). The purposes of the treaty, so far as they are here material, are set forth in the preamble as follows:
*149 Whereas, the political connexion heretofore existing between the Choctaw and the Chickasaw tribes of Indians, has given rise to unhappy and injurious dissensions and controversies among them, which render necessary a readjustment of their relations to each other and to the United States: and whereas, the United States desire that the Choctaw Indians shall relinquish all claim to any territory west of the one hundredth degree of west longitude, and also to make provision for the permanent settlement within the Choctaw country, of the Wichita and certain other tribes or bands of Indians, for which purpose the Choctaws and Chickasaws are willing to lease, on reasonable terms, to the United States, that portion of their common territory which is west of the ninety-eighth degree of west longitude, * * *
Article 1 of the treaty, after defining the boundaries of the Choctaw and Chickasaw country by metes and bounds* provides as follows:
And pursuant to an act of Congress approved May 28, 1830, the United States do hereby forever secure and guarantee the lands embraced within the said limits, to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common; so that each and every member of either tribe shall have an equal, undivided interest in the whole.
The plaintiff Indians rely largely on the provisions of Article 1 of the Treaty of 1855 in support of their contention that the moneys arising from the sale or disposition of the common properties of the Choctaw and Chickasaw tribes should have been apportioned and paid on the basis of 76.74% to the Choctaws and 23.26% to the Chickasaws. It is contended that the phrase “so that each and every member of either tribe shall have an equal, undivided interest in the whole” guaranteed that the common funds of the two tribes derived from subsequent sales or disposition of lands belonging to them in common would be disbursed without reference to the particular tribal enrollment of the Indians in such manner as would give to each and every individual member of the two tribes an equal amount of money.
*150 We think plaintiff’s contention misconstrues the intent and meaning of the language used in Article 1 of the treaty. The warranty of the lands in the said article, as stated therein, was made pursuant to the act of Congress approved May 28, 1830 (4 Stat. 411). This act was entitled “An Act to provide for an exchange of lands with the Indians rresiding in any of the states or territories, and for their ■.removal west of the river Mississippi.” The act so far as here pertinent reads:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall and may be lawful for the President of the United States to cause so -much of any territory belonging to the United States, west of the river Mississippi, not included in any state or organized territory, and to which the Indian title has been extinguished, as he may judge necessary, to be divided into a suitable number of districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there; and to cause each of said districts to be so described by natural or artificial marks, as to be easily distinguished from every other.
Sec. 2. And be it fwrther enacted, That it shall and may be lawful for the President to exchange any or all of such districts, so to be laid off and described, with any tribe or nation of Indians now residing within the limits of any of the states or territories, and with which the United States have existing treaties, for the whole or any part or portion of the territory claimed and occupied by such tribe or nation, within the bounds of any one or more of the states or territories, where the land claimed and occupied by the Indians, is owned by the United States, or the United States are bound to the state within which it lies to extinguish the Indian claim thereto.
Sec. 3. And be it further enacted, That in the making of any such exchange or exchanges, it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made, that the ' United States will forever secure and guaranty to them, and their heirs or successors, the country so exchanged with them; and if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: * * *
*151 The explicit language of this act makes it clear that in the exchange of lands with Indian tribes or nations the dealings contemplated were with Indian tribes and nations in their political capacities and not with the individual members of the tribes or nations. Likewise the assurance, which the President in section 3 of the Act was authorized to make, to the tribe or nation with which an exchange was made that the United States would forever “secure and guaranty to them, and their heirs or successors, the country so exchanged with them”, was to be made to the tribe or nation as a political entity, rather than to the individual members of such tribe or nation. The warranty in Article 1 of the treaty of 1855 in which the United States forever secured and guaranteed the lands embraced in the Choctaw and Chickasaw country to the members of such tribes, their heirs or successors, to be held in common “so that each and every member of either tribe shall have an equal, undivided interest in the whole” was made pursuant to the act of. May 28, 1830, and must be considered and construed in connection with its provisions.
The intent and meaning of the phrase “so that each and every member of either tribe shall have an equal, undivided interest in the whole” must also be considered in connection with the other articles of the treaty of 1855, and the purposes sought to be attained by the parties in making it.
The primary reasons and purposes for making the treaty as stated in the preamble were twofold:
First. “Unhappy and injurious dissensions and controversies” had arisen between the Choctaws and Chickasaws because of their “political connection”, which rendered a readjustment of their relations to each other and to the United States necessary.
Second. The desire of the United States that the Choctaw Nation release all claims to any territory west of the one-hundredth degree of west longitude, and also to make provision for the permanent settlement within the Choctaw country of certain other bands or tribes of Indians.
The exact nature of the dissensions and controversies that had arisen between the Choctaw and the Chickasaw Nations *152 which made a readjustment of their relations to each other and to the United States necessary does not appear. However, it is clear that they arose because of the unsatisfactory political connection between them created by the treaty of 1837. The troubles, whatever they may have been, were of a political nature and concerned the rights and obligations, of the tribes as separate and distinct political entities. They were regarded and treated as separate and distinct political entities in the treaty of 1855 and their relationship to each other and to the United States was readjusted and fixed on. that basis, as clearly appears from following provisions, of the treaty.
Article 4 provided that the government and laws then in operation, and not incompatible with the treaty, should remain in full force within the limits of the Chickasaw district, until the Chickasaws should adopt a constitution.
Article 5 secured to members of each tribe the right to-freely settle within the jurisdiction of the other, and have all the rights, privileges, and immunities of citizens thereof,, except that no member of either tribe should participate in the funds belonging to the other tribe.
Article 6 provided for the surrender of fugitives from justice of either tribe.
Article 7 secured to each tribe the unrestricted right of self-government, and, with certain exceptions not material here, full jurisdiction over persons and property within their respective limits.
The political connection existing between the Choctaw and' Chickasaw Nations as a result of the treaty of 1837 was; dissolved and discontinued by the foregoing provisions of the-treaty of 1855 and each of the two tribes again became a single and separate political entity in every respect, and the-political relationship of the two Nations to each other and to the United States was determined and readjusted on that basis. When Article 1 of the treaty of 1855 is considered’ together with these provisions of the treaty, as well as with section 3 of the act of 1830, it seems clear that the lands-, secured and guaranteed to the members of the Choctaw and Chickasaw tribes by that article became the common property of the said tribes in their separate corporate capacity,. *153 and that the phrase “so that each and every member of either tribe shall have an equal, undivided interest in the whole” has reference solely to the use and occupancy of the land and not to an equal, undivided interest in moneys arising from the sale or other disposition of the lands. This conclusion seems inescapable when consideration is had of succeeding articles in the same treaty where funds arising from the disposition of common properties of the tribes are specifically dealt with and are apportioned and paid on an entirely different basis.
The second primary purpose of the treaty of 1855, as heretofore pointed out, was to secure the relinquishment by the Choctaw Nation of lands claimed west of the one-hundredth degree of west longitude, and also the making of provisions for the permanent settlement of other Indian tribes within the limits of the Choctaw country. This purpose was attained by Articles 9 and 10 of the treaty. By Article 9 it was provided:
The Choctaw Indians do hereby absolutely and forever quitclaim and relinquish to the United States all their right, title, and interest in, and to any and all lands, west of the one-hundredth degree of west longitude ; and the Choctaws and Chickasaws do hereby lease to the United States all that portion of their common territory west of the ninety-eighth degree of west longitude, for the permanent settlement of the Wichita and such other tribes or bands of Indians as the Government may desire to locate therein; excluding, * * * Provided, however, the territory so leased shall remain open to settlement by Choctaws and Chickasaws as heretofore.
The amount to be paid by the United States to the Choctaw and Chickasaw Nations in consideration of the foregoing relinquishment and lease of their common lands was fixed in Article 10 of the treaty, as was the manner in which such moneys should be apportioned and paid to the respective tribes:
In consideration of the foregoing relinquishment and lease, and, as soon as practicable after the ratification of this convention, the United States will pay to the Choctaws the sum of six hundred thousand dollars, and to the Chickasaws the sum of two hundred thousand *154 dollars, in such manner as their general councils shall respectively direct.
Thus the Choctaw and Chickasaw Nations agreed with the United States that the moneys arising from the relinquishment and lease of their common lands should be apportioned and paid on the basis of three-fourths to the Choctaws and one-fourth to the Chickasaws. Not only that, but it is highly significant that the moneys were to be paid to the Choctaws and Chickasaws in such manner as their general councils shall respectively direct, thus showing that the United States in this agreement was dealing with the tribes in their corporate capacities as separate and distinct political entities, and not with their individual members. When it is considered that the United States, in negotiating the treaty of 1855, at all times recognized the Choctaws and Chickasaws as separate and distinct political entities, and dealt with them on that basis, in readjusting their political relations to each other and to the United States, and also in securing a relinquishment and lease of their lands and paying for the same, there is no conflict between Articles 1 and 10 of the treaty. The guaranty in Article 1 of the treaty in respect to the lands held in common by the two tribes had reference solely to the use and occupancy of the lands while so held, while Article 10 dealt directly with moneys arising from the disposition of the lands, and established a definite basis for the apportionment and payment of the moneys, three-fourths to the Choctaws and one-fourth to the Chickasaws.
The basis fixed and agreed upon in Article 10 of the treaty of 1855 for the apportionment and payment of the moneys arising out of the disposition of the common property of the Choctaw and Chickasaw Nations, in proportion of three-fourths to the Choctaws and one-fourth to the Chickasaws, was restated and reaffirmed in the treaty of April 28, 1866, 14 Stat. 769, to which both the Choctaw and Chickasaw Nations were parties. In Article 3 of this treaty the Choctaws and Chickasaws in consideration of the sum of $300,-000 ceded to the United States the territory west of the 98th degree west longitude which had been leased to the United *155 States by the Indians in the treaty of 1855. It was provided :
* * * the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw Nations in the proportion of three-fourths to the former and one-fourth to the latter.. * * *
By Article 30 it was provided:
The Choctaw and Chickasaw Nations will receive into their respective districts east of the ninety-eighth degree of west longitude, in the proportion of one-fourth in the Chickasaw and three-fourths in the Choctaw Nation, civilized Indians from the tribes known by the general name of the Kansas Indians * * * who shall have in the Choctaw and Chickasaw Nations, respectively, the same rights as the Choctaws and Chickasaws, * * * with the exception of the right to participate in the Choctaw and Chickasaw annuities and other moneys, and in the public domain, should the same or the proceeds thereof be divided per capita among said Choctaws and Chickasaws, and among others the right to select land as herein provided for Choctaws and Chickasaws * * *
By Article 33 it was provided:
All lands selected as herein provided shall thereafter be held in severalty by the respective parties, and the unselected land shall be the common property of- the Choctaw and Chickasaw nations, in their corporate ca- . pacities, subject to the joint control of their legislative authorities.
By Article 37 it was provided:
In consideration of the right of selection hereinbefore accorded to certain Indians other than the Choctaws and Chickasaws, the United States agree to pay to the Choctaw and Chickasaw nations, out of the funds of Indians removing into said nations respectively, under the provisions of this treaty, such sum as may be fixed by the legislatures of said nations, not exceeding one dollar per acre, to be divided between the said nations in the proportion of one-fourth to the Chickasaw nation, and three-fourths to the Choctaw nation * * *
By Article 46 it was provided:
Of the moneys stipulated to be paid to the Choctaws and Chickasaws under this treaty for the cession of the leased district, and the admission of the Kansas *156 Indians among them, the sum of one hundred and fifty thousand dollars shall be advanced and paid to. the Choctaws, and fifty thousand, dollars to the Chickasaws * * *
Articles 3 and 37 deal directly with the apportionment and payment of moneys arising from the disposition and management of the common properties of the Choctaw and Chickasaw Nations and fix the basis of such apportionment and payment in the proportion of three-fourths to the Choctaws and one-fourth to the Chickasaws, as did Article 10 of the treaty of 1855. Article 30 fixes the basis on which the Choctaw and Chickasaw Nations will receive, into their respective districts, other Indian tribes, which under preceding provisions of the treaty they had agreed might settle among them. The basis on which other Indians were to be received was likewise in the proportion of three-fourths in the Choctaw Nation and one-fourth in the Chickasaw Nation, which provision is particularly significant of the understanding of the parties as to the proper basis for the apportionment and payment of moneys arising from the disposition of their common properties. The declaration in Article 33 that the remaining lands “shall be the common property of the Choctaw and Chickasaw Nations, in,their corporate capacities, subject to the joint control of their legislative authorities”, refutes the plaintiff’s contention that Article 1 of the treaty of 1855 vested in each and every member of either tribe an equal, undivided interest in the common lands of the two tribes, and a like interest in all proceeds arising from the sale or disposition otherwise of such lands.
The basis agreed upon and fixed in the treaties of 1855 and 1866 for the apportionment and payment of moneys arising from the disposition of the common properties of the Choctaw and Chickasaw Nations under those treaties, in the proportion of three-fourths to the former and one-fourth to the latter, has since been adopted and consistently followed by the legislative and executive branches of the Government in the apportionment and payment of all moneys similarly arising.
The act of Congress of August 2, 1882, 22 Stat. 181, granted to the St. Louis and San Francisco Railroad a right- *157 of-way for a railroad and telegraph line through the Choctaw and Chickasaw lands for which the railroad company was to pay quarterly to the national treasurer of the said Nation, for the benefit of schools therein, seven hundred and fifty dollars, “one-fourth of said payments to be paid to the Chickasaws and three-fourths to be paid to the Choctaws.”
Section 4 of this Act provided:
* * * if the general councils of the Choctaw and Chickasaw Nations, or either of them, shall within sixty days after the passage of this act, by resolution duly adopted, dissent from the allowance provided for in this section, and shall certify the same to the Secretary of the Interior, then the compensation to be paid for the use and grants in this act made for such dissenting tribe shall be determined * * *.
Many other acts of Congress gave railroad companies the right to acquire lands for rights-of-way and station grounds over the lands of the Choctaw and Chickasaw Nations. It was provided in these acts, the language being identical in all of them, that
The money paid to the Secretary of the Interior under the provisions of this act shall be apportioned by him in accordance with the íaws and treaties now in force between the United States and said nations and tribes. * * *
The moneys received by the Secretary of the Interior under the. provisions of these acts were apportioned and paid to the Choctaw and Chickasaw Nations in the proportion of three-fourths to the Choctaws and one-fourth to the •Chickasaws. So far as the record shows neither of the Nations ever raised any question in respect.to the apportionment and payment of the moneys to them, indicating clearly that they considered that basis of apportionment and payment to be in accordance with the laws and treaties then in force between them and the United States, as it unquestionably was.
The Indian Appropriation Act of March 3, 1891, 26 Stat. 989, 1025, contained the following provision:
And the sum of two million nine hundred and ninety-one thousand four hundred and fifty dollars be, and *158 the same is hereby, appropriated out of any money in the Treasury not otherwise appropriated, to pay the Choctaw and Chickasaw Nations of Indians for all the right, title, interest, and claim which said nations of Indians may have in, and to certain lands now occupied by, the Cheyenne and Arapahoe Indians under executive order; * * * three-fourths of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Choctaw Nation to receive the same, at such time and in such sums as directed and required by the legislative authority of said Choctaw Nation, and one-fourth of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Chickasaw Nation to receive the same, at such times and in such sums as directed and required by the legislative authority of said Chickasaw Nation; * * *
The General Council of the Choctaw Nation by formal Act on April 9, 1891, made requisition for its three-fourths part of the said appropriation, $2,243,587.5o.[1] The legislature of the Chickasaw Nation by formal Act on April 1, 1891, made requisition for its one-fourth part of the appropriation, $747,862.50.[2]
Thus the two Nations, through Acts of their national legislatures, in a matter involving vast sums of money, sol *159 emnly ratified and reaffirmed the basis established in the treaties of 1855 and 1866, and running thereafter through numerous acts of Congress, as the proper and legal basis for the apportionment and payment of moneys arising from the disposition of their common properties, three-fourths to the Choctaw Nation and one-fourth to the Chickasaw Nation.
The act of June 10, 1896, 29 Stat. 321, provided for the location of absentee Wyandotte Indians upon the lands of the Choctaw and Chickasaw Nations in accordance with the provisions of the treaty of 1866. Twenty one thousand six hundred eighty six dollars and eighty cents was provided for the payment to the Choctaw and Chickasaw Indians as compensation for the lands thus taken and used. In reference to the apportionment and payment of such moneys it was provided:
* * * which said fund shall be paid to the National treasurers of the Choctaw and Chickasaw Nations in the proportions of three-fourths to the former and one-fourth to the latter * * *..
The basis for the apportionment and payment of moneys arising from the disposition of the common properties of the Choctaw and Chickasaw Nations, in the proportion of three-fourths to the former and one-fourth to the latter, was definitely fixed in Article 10 of the treaty of 1855, Articles 3 and 37 of the treaty of 1866, and numerous acts of Congress. Immense sums of money were apportioned and paid to the respective tribes on that basis. For a period of almost sixty years following the treaty of 1855 the Choctaw Nation received its proportionate share of such moneys, at no time challenging in any way the correctness of the basis on which the payments were made. At all times prior to 1898 this was the established and accepted legal basis for the distribution of all common funds of the two tribes. Unless this basis was changed by the agreements and acts of Congress under which the moneys here involved were collected and distributed it remained and was the legal basis for the apportionment and payment of such moneys.
.The act of March 3, 1893, 27 Stat. 612, provided for the appointment of commissioners to enter into negotiations with the five civilized tribes, comprising the Cherokee *160 Nation, the Choctaw Nation, the Chickasaw Nation, the Muskogee or Creek Nation and the Seminole Nation, for the purpose of the extinguishment of the national or tribal title to their lands in Indian territory, either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes respectively entitled to the same or such other method as might be agreed upon between the several nations, or each of them with the United States, with a view to such an adjustment, upon the basis of justice and equity, as might be necessary and suitable to enable the ultimate creation of a state or states of the union embracing the lands of the said nations or tribes. Pursuant to this Act, and to accomplish the purposes therein stated, the Commissioners of the United States (The Dawes Commission) negotiated an agreement with the Choctaw and Chickasaw Nations on April 23, 1897. This treaty, known as the “Atoka Agreement1”, was incorporated in the act of June 28, 1898, 30 Stat. 495, as section 29 thereof. The “Atoka Agreement” was followed and superseded by an agreement entered into by the same parties on March 21, 1902, 32 Stat. 641.
Section 29 of the act of June 28, 1898, provides:
That all lands within the Indian territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes so as to give to each member of these tribes so far as possible a fair and equal share thereof, considering the character and fertility of the soil and the location and value of the lands.
No provision is made in the agreement for the sale or disposition of the lands remaining after allotments had been made to individual members of the tribes.
It was further provided:
All coal and asphalt in or under the lands allotted and reserved from allotment shall be reserved for the sole use of the members of the Choctaw and Chickasaw tribes, exclusive of freedmen,
and that
It is agreed that all the coal and asphalt within the limits of the Choctaw and Chickasaw Nations shall remain and be the common property of the members of *161 the Choctaw and Chickasaw tribes (freedmen excepted), so that each and every member shall,.have an equal arid undivided interest in the whole.
In respect to town sites it was provided in the agreement that “* * * there shall be appointed a commission for each of the two Nations”, and that
The money paid into the United States Treasury for the sale of all town lots shall be for the benefit of the members of the Choctaw and Chickasaw tribes (freedmen excepted), and at the end of one year from the ratification of this agreement, and at the end of each year thereafter, the funds so accumulated shall be divided and paid to the Choctaws and Chickasaws (freedmen excepted), each member of the two tribes to receive an equal portion thereof.
Section 15 of the Act also deals with the question of town sites and provides:
That there shall be a commission in each town for each one of the Chickasaw, Choctaw, Creek, and Cherokee tribes, * * *,
and in reference to moneys derived from the sale of town lots provides:
And all such moneys shall, when titles to all the lots in the towns belonging to any tribe have been thus perfected, be paid per capita to the members of the tribe.
Section 16 makes it unlawful for any person, except as otherwise provided in the Act, to claim, demand, or receive for his own use or for the use of any one else, any royalty on oil, coal, asphalt, or other mineral, or on any timber or lumber, or any kind of property whatever, or any rents on any lands or property belonging to any one of said tribes or nations, and provides that:
All royalties and rents hereafter payable to the tribe shall be paid, under such rules and regulations as may be prescribed by the Secretary of .the Interior, into the treasury of the United States to the credit of the tribe to which they belong.
The agreement of 1902 contains detailed provisions for the enrollment of the Choctaw and Chickasaw Indians and •their' freedmen, • and for - the allotment of land to ■ them in severalty, for the sale of the residue of their lands, after *162 the equalization of allotments had been made, and the per capita distribution of the moneys arising therefrom. In section 14 it is provided:
When allotments as herein provided have been made to all citizens and freedmen, the residue of lands not herein reserved or otherwise disposed of, if any there be, shall be sold at public auction under rules and regulations and on terms to be prescribed by the Secretary of the Interior, and so much of the proceeds as may be necessary for equalizing allotments shall be used for that purpose, and the balance shall be paid into the Treasury of the United States to the credit of the Choctaws and Chickasaws and distributed per capita as other funds of the tribes.
Sections 56 to 63, inclusive, relate to the sale of coal and asphalt deposits and the per capita distribution of the proceeds thereof. In section 56 it is provided:
At the expiration of two years after the final ratification of this agreement all deposits of coal and asphalt which are in lands within the limits of any town site established under the Atoka agreement, or the act of Congress of May 31, 1900, or this agreement, and which are within the exterior limits of any lands reserved from allotment on account of their coal or asphalt deposits, as herein provided, and which are not at the time of the final ratification of this agreement embraced in any then existing coal or asphalt lease, shall be sold at public auction for cash under the direction of the President as hereinafter provided, and the proceeds thereof disposed of as herein provided respecting the proceeds of the sale of coal and asphalt lands.
Section 59 provides for the disposition of the proceeds arising from the sale of coal and asphalt lands as follows:
The proceeds arising from the sale of coal and asphalt lands and coal and asphalt deposits shall be deposited in the Treasury of the United States to the credit of said tribes and paid out per capita to the members of said tribes (freedmen excepted) with the other moneys belonging to said tribes in the manner provided by law.
Section 64 provides for the laying out of the White Sulphur Springs reservation and for payment for the lands so taken. It also provides:
And such moneys shall, upon the dissolution of the tribal governments, be divided per capita among the *163 members of the tribes (freedmen excepted), as are other funds of the tribes.
The foregoing are the only provisions of the agreements of 1898 and 1902 bearing directly on the matter of the apportionment and payment of, the moneys involved. With a single exception, to be subsequently considered, the moneys were to be “paid into the Treasury of the United States to the credit of the Choctaws and Chickasaws and distributed per capita as other funds of the tribes”, or “deposited in the Treasury of the United States to the credit of said tribes * * * and paid out per capita to the members of said tribes * * * with other moneys belonging to said tribes in the manner provided by law.” The moneys were to be •credited and paid out as other funds of the tribes. For almost fifty years, as we have seen, all moneys arising from the disposition of their common properties had been credited to the respective tribes in the proportion of three-fourths to the Choctaws and one-fourth to the Chickasaws. This basis for the apportionment and payment of their common funds had been fixed in the treaties of 1855 and 1866 and in numerous acts of Congress, and was undoubtedly the “manner provided by law” for the crediting and payment of the funds. When, therefore, it was stated in provision after provision that these funds be credited and paid “as other funds of the tribes” or “in the manner provided by law” it was intended by the parties to the agreements that the existing and long established basis of apportionment and payment of such moneys be not changed or altered in any respect. The two Nations knew the basis on -which their common funds had been apportioned and paid to them for a half century, and had the parties to these agreements intended to change such basis, and provide another, in respect to the funds in question they would undoubtedly have expressed such intention in clear and unmistakable terms.
The exception mentioned is the provision appearing in the 1898 agreement that the moneys arising from the sale of town sites “shall be divided and paid to the Choctaws and Chickasaws (freedmen excepted), each member of the two tribes to receive an equal portion thereof.” This provision relates solely to town site moneys, which constitute a minor portion of the funds in controversy, and *164 under no conceivable construction can be held applicable to the apportionment and payment of moneys arising from other sources. Furthermore, the town site and other provisions of the agreement of 1898 were superseded by the act of May 81, 1900, 31 Stat. 221, and the agreement of 1902, under which the Government thereafter acted in matters relating to the sale or other disposition of the lands and common properties of the two Nations.
The proportional interest of the two tribes in moneys arising from the disposition of their common properties, as fixed in preceding treaties and acts of Congress on the basis of three-fourths to the Choctaws and one-fourth to the Chickasaws, was in no way changed-in the agreements of 1898 and 1902. That was the legal basis for the apportionment and payment of the moneys involved in suit. The United States apportioned and paid such moneys to the respective Nations on that basis. Consequently the plaintiff, the Choctaw Nation, has no legal complaint against either the United States or the Chickasaw Nation, and the petition must be dismissed.
It is so ordered.
Whaley, Judge; LittletoN, Judge; GreeN, Judge; and Booth, Chief Justice, concur.

An act to comply'with the requirements of the act of Congress, approved March 3, 1891, making an appropriation to compensate the Choctaws and Chickasaws for their interest in the lands lying south of the Canadian River, now occupied under executive order by the Cheyenne and Arapahoe Indians * * \
Now, therefore, he it enacted by the legislature of the Chickasaw Nation, That Benjamin F. Byrd, treasurer of the Chickasaw Nation be, and he hereby is, authorized to receive, on behalf of the Chickasaw Nation, the sum of seven hundred and forty-seven thousand eight hundred and sixty-two dollars and fifty cents, being one fourth part of the amount appropriated in said act of Congress to compensate the Choctaw and Chickasaw nations for their interest in the lands lying south of the Canadian River and now occupied, under executive order, by the Cheyenne and Arapahoe Indians.
—(Senate Executive Document No. 42, 52nd Congress, 1st Session.)