Jones, Judge,
delivered the opinion of the court:
The Chickasaw Nation as plaintiff instituted this suit to recover the value of a one-fourth interest in certain lands in a triangular strip between two surveys of the eastern bound-aiy line of a general tract of land that had been ceded to the Choctaw Nation in 1825.
The plaintiff, the Chickasaw Nation, claims that by the Treaties of 1820 (7 Stat. 210), and 1825 (7 Stat. 234), the United States Government ceded a tract of land in Arkansas and Oklahoma to the Choctaw Nation; that in running the eastern boundary line of such tract an error was made; that the treaty called for a line running due south from a point one hundred paces east of Fort Smith, but that the surveyor bore to the west and did not cover in the actual survey all the lands ceded to the Choctaws; that in 1837 the plaintiff purchased an interest in all these lands; and that by the Act of Congress approved March 3, 1875, supra, the erroneous survey was confirmed and the disputed strip transferred to the public domain, thus depriving the plaintiff of its interest in the disputed strip.
The defendant admits the error in the original survey, but claims that the lands were taken, not by the Act of March 3, *224 1875, but by the original survey made in November and December 1825, pursuant to the Treaty of 1825, and that the lands therefore were taken from the Choctaw Nation alone before the Chickasaw Nation had purchased an interest in the tract.
Defendant filed a cross complaint against the Choctaw Nation pleading that if judgment is rendered against it in favor of the Chickasaw Nation, defendant be given in like amount over against the Choctaw Nation. Hereafter in this opinion the term defendant, unless otherwise specified, refers to the United States.
The central issue is whether the lands were legally taken at the time the erroneous survey was made under the Treaty of 1825, or by the Act of Congress approved March 3, 1875, which officially confirmed the erroneous survey.
Under the jurisdictional act approved June 7, 1924 (43 Stat. 537), limitations are waived and the court is directed to hear, examine, and render judgment in any and all legal and equitable claims growing out of any treaty or agreement between the United States and the Choctaw and Chickasaw Indian Nations or Tribes, or growing out of any act of Congress dealing with such tribes, if such claims have not heretofore been adjudicated on their merits.
By the Treaties of 1820 and 1825 the Choctaw Nation wasS ceded a large tract of land in Arkansas and Oklahoma.
In surveying the eastern boundary line instead of running it due south from point of origin as called for by the treaty, the surveyor, one Conway, ran a line which bore to the westward, leaving a triangular tract which under the treaty should have been included in the Indian lands, but which actually was left out of the Indian tract.
By the Treaty of January 17, 1837 (11 Stat. 573), the Chickasaws for a consideration of $530,000.00 purchased an interest in the tract that had been ceded to the Choctaws by the Treaties of 1820 and 1825.
By the Treaty of 1855 (11 Stat. 611), the Choctaws and Chickasaws ceded certain lands in the western part of the Indian tract and also leased certain other lands in that area to the United States Government. For this the tribes were *225 paid $800,000.00, three-fourths of which was paid to the Choctaws and one-fourth to the Chickasaws.
Before the Treaty of 1855 the markings of the eastern boundary line were disappearing, and a stipulation was put in that treaty providing for a resurvey for the purpose of distinctly and permanently marking the eastern boundary line of the Indian lands.
This survey was made in 1857. Soon after the survey was begun, it was discovered for the first time that an error had been made in the survey of 1825 and that the eastern boundary line of such survey bore to the westward from the due north and south line. When this was discovered it was reported to the Commissioner of Indian Affairs, who instructed the surveyor to proceed no further with the survey of the true north and south line, but to confine his assignment to retracing the original line as actually surveyed and to mark the same in a distinct and permanent manner, which was done.
In 1877, pursuant to the Act of 1875, a surveyor for the first time ran a line due south from one hundred paces east of Fort Smith and thus for the first time determined the physical position of what was intended to be the true eastern boundary line of the Indian lands. Following this the calculation was made as to the amount of land between the original survey of the eastern boundary line and the north and south line as called for by the treaty of cession. It was found to be 136,204.02 acres.
Under the Act of March 3, 1881 (21 Stat. 504), the Court of Claims was given jurisdiction to try the various questions of difference which had arisen under the treaties which had been made with the Choctaw Nation. Among the several items which were before the court in the trial of the case filed by the Choctaw Indians under the authority of that act was the disputed tract of land which forms the basis of the instant suit. In passing upon this issue the Court of Claims in the case of The Choctaw Nation v. United States, 21 C. Cls. 59, found as a fact that an error was made in the original survey of the eastern boundary line and that as a consequence the tract of land involved in this suit was not included in the Indian lands as originally surveyed. They found that the value of this tract of 136,204.02 acres was *226 $68,102.00. In adjusting tbe various items of dispute between the Choctaw Nation and the defendant, the Choctaw Nation was allowed $68,102.00 for the lands thus taken in fixing the boundary between the State of Arkansas and the Indian country.
While the case was reversed by the Supreme Court, The Choctaw Nation v. United States, 119 U. S. 1, this particular item as decided by the Court of Claims Was permitted to stand.
The Chickasaw Nation was not made a party to this suit.
At this particular point two questions arise:
1. Did the Chickasaw Indians obtain a title interest in these lands prior to the survey made in 1857 pursuant to the Treaty of 1855?
2. Was the land legally taken by the Government by the survey made pursuant to the Act of 1825, or was it legally taken at a later date ?
We think the first question must be answered in the affirmative.
It is conceded that the Choctaw Nation was given title to these lands.
Prior to thei Treaty of 1887 the United States Government purchased the interest which the Chickasaw Nation had in lands in Mississippi and undertook to find a location for them farther west. By the Treaty of 1837 between the Chickasaw Nation and the Choctaw Nation the Chickasaw Nation purchased an interest in the lands in Arkansas and Oklahoma which the Choctaw Nation had secured from the United States by the Treaties of 1825 and 1830. The consideration paid by the Chickasaws to the Choctaws was $530,000.00. This treaty was approved and confirmed by the President of the United States. Article I of that treaty is as follows:
It is agreed by the Choctaws that the Chickasaws shall have the privilege of forming a district within the limits of their country, to be held on the same terms that the Choctaws now hold it, except the right of disposing of it, which is held in common with the Choctaws and Chickasaws, to be called the Chickasaw district of the Choctaw Nation, to have an equal representation in their General Council, and to be placed on an equal *227 footing in every other respect with any of the other districts of said nation, except a voice in the management of the consideration which is given for these rights and privileges; and the Chickasaw people to be entitled to all the rights and privileges of Choctaws, with the exception of participating in the Choctaw annuities, and the consideration to be paid for these rights and privileges, and to be subject to the same laws to which the Choctaws are; but the Chickasaws reserve to themselves the sole right and privilege of controlling and managing the residue of their funds, as far as is consistent with the late treaty between the said people and the Government of the United States, and of making such regulations and electing such officers for that purpose as they may think proper.
Article V gave the Choctaws and Chickasaws equal rights to settle in whatever district they wished.
We think the fact that according to the terms of the treaty the Chickasaws were to be put on an equal footing in every respect with the Choctaws, including the common holding of the lands by the Chickasaw and Choctaw Nations, with the further provision that equal rights and privileges should pertain to both Choctaws and Chickasaws to settle in whatever district they might think proper, together with the later treaty guaranteeing to the Choctaws and Chickasaws the lands in the Indian country lying west of the eastern boundary line running due south from a point one hundred paces east of Fort Smith, precludes any other reasonable conclusion than that the Chickasaws were given a full interest in all the lands that were conveyed to the Choctaws by the Treaties of 1825 and 1830.
The subsequent relationship between the Chickasaws and Choctaws through a long period of years bears out and confirms this conclusion.
This conclusion is further buttressed by the fact that under the Treaty of 1855 the Choctaws and Chickasaws released rights in certain of these lands and also agreed to lease certain other lands to the United States, and that as a consideration for these concessions the United States paid the Choctaws $600,000.00 and the Chickasaws $200,000.00. This is the division of funds that has been approved by the *228 United States in the dealings between the two nations throughout the many years which followed.
In this treaty the United States guaranteed to the Choctaws and Chickasaws the Indian tract lying west of a line running due south from a point one hundred paces east of Fort Smith.
Article I, Treaty of 1855, after identifying such eastern boundary, reads in part as follows:
* * * the United States do hereby forever secure and guarantee the lands embraced within the said limits, to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common; so that each and every member of either tribe shall have an equal, undivided interest in the whole: Provided, however, no part thereof shall ever be sold without the consent of both tribes; and that said land shall revert to the United States if said Indians and their heirs become extinct, or abandon the same.
Attention is further called to the fact that the interest of the Chickasaws in the lands was recognized by subsequent acts and treaties. The Appropriation Act of March 3, 1891 (26 Stat., 989, 1025), appropriated a sum of money “to pay the Choctaw and Chickasaw Nations of Indians for all the right, title, interest, and claim which said nations of Indians may have in, and to certain lands occupied by, the Cheyenne and Arapahoe Indians under executive order; * * Then followed a provision stipulating for the division of this fund, three-fourths to the Choctaw Nation and one-fourth to the Chickasaw Nation. The Act of June 10, 1896 (29 Stat., 321, 344), made provision for locating Wyandotte Indians upon the lands of the Choctaw and Chickasaw Nations in accordance with the provisions of the Treaty of 1866. (17 Stat. 769, 777, 778.) In apportioning the payment for such privilege it was provided “* * * which said fund shall be paid to the national treasurer of the Choctaw and Chickasaw Nations in the proportions of three-fourths to the former and one-fourth to the latter.”
In the treaty between the Choctaw and Chickasaw Nations which was incorporated in the Act of June 28,1898 (30 Stat., 495, 505), as Section 29 of such act, the interest of the Chick *229 asaw Nation in the lands was again recognized. The lands were referred to as belonging to the Choctaw and Chickasaw Indians and it was further provided that all coal or asphalt in or under the lands should be reserved for the sole use of the Choctaw and Chickasaw tribes and that the same should remain and be the common property of the members of such tribes.
Apparently, with the single exception of the lands and proceeds involved in this suit, since the Treaty of 1837 and extending to the present time, every acre of land that has been allotted and every dollar that has been distributed from the sale or disposition of such common lands,- has been on the basis of common ownership; and the division has been three-fourths to the Choctaws and one-fourth to the Chickasaws.
For discussion of the proportional interest of the two tribes in moneys arising from the disposition of their common properties, see Choctaw Nation v. United States and The Chickasaw Nation, 83 C. Cls., 140, 145 et seq.
The second question presents greater difficulties.
We have concluded that the tract of land in dispute was not legally taken until after the Treaty of 1855; that the first disclosure of the error in the earlier survey was made by the survey following such treaty; that there followed a period of years of dispute and that by the act of 1875 the lands were definitely and legally taken by the defendant and such lands legally transferred to the public domain.
It is true that the lands were physically taken by the erroneous survey following the Treaty of 1825, but between that date and the survey made in 1857 pursuant to the Treaty of 1855 neither the Choctaw Nation nor the defendant had any knowledge of the error in the survey made under the Treaty of 1825. In the meantime, the Chickasaw Nation had acquired its rights in the lands. As to the importance of knowledge in connection with the act of taking see United States v. Creek Nation, 295 U. S. 103; Shoshone Indians v. United States, 299 U. S. 476.
In the Creek Nation case, supra, the United States granted to the Creek Tribe by patent a large tract of land in the Indian Territory, now Oklahoma. By a Treaty of 1866, *230 (14 Stat., 785), the Creeks re-ceded to the United States the western half of that tract, but expressly retained the eastern half. The United States stipulated that it would cause a north and south line separating the ceded from the unceded lands to be surveyed under the direction of the Commissioner of Indian Affairs and guaranteed to the Creeks quiet possession of the unceded lands.
In 1871 one Bardwell, acting under the direction of the Commissioner of Indian Affairs, surveyed the divisional line.
In 1867 the United States entered into a treaty with the Sac and Fox Indians under which it assigned to them a tract of land within the area ceded by the Creeks and immediately west of the area retained by them.
In 1872 one Darling, a surveyor acting for the Government, surveyed the Sac and Fox tract and erroneously extended the lines into the unceded Creek lands. Darling’s survey was approved by the Commissioner of the General Land Office in 1878. As a result of this survey and its approval, a strip of Creek land, aggregating 5,575 acres, was erroneously included within the Sac and Fox tract and thereafter was occupied by the Sac and Fox. In 1875 another government surveyor, following Darling’s line, subdivided the sections in the Sac and Fox land into 40-acre tracts, extending them into the unceded Creek land, thereby perpetuating Darling’s error.
Under an agreement ratified by the Act of Congress of February 13,1891 (26 Stat. 749, 750), the United States made allotments in severalty to the Sac and Fox Indians out of the land within their cession. In carrying that act into effect, the Indian and land bureaus erroneously treated the strip of unceded Creek land as a part of the Sac and Fox cession, and accordingly allotted and patented part of the strip to Sac and Fox Indians. The point at issue in the case was the time as to which the value of the land taken should be ascertained.
In deciding this issue the court at page 111 uses the following language: *231 to do so. The most that can. be said of it is that it was done erroneously and, in the absence of correction, might lead to further error.
*230 Plainly the appropriation was not in 1873, when Darling’s survey was approved by the Commissioner of the General Land Office. That survey did not effect any. change in the existing ownership; nor was it intended
*231 But not so of the disposals.under the act of 1891. They were intended from their inception to effect a change of ownership and were consummated by the issue of patents, the most accredited type of conveyance known to our law. True, they rested on an erroneous application of the act of 1891 to the Creek lands in the strip; but, as that application was confirmed by the United States, the matter stands as if the act had distinctly directed the disposals. It was through them that the lands were taken; so the compensation should be based on the value at that time, and not, as ruled below, on the value when the suit was begun.
In the case of Shoshone Indians v. United States, 299 U. S. 476, it was held that the time of taking the lands was not the date of the passing of the jurisdictional act, but that by the action and inaction of the executive and legislative branches of the Government, the de facto appropriation, originally tortious, was ratified, and that through the doctrine of relationship the time of taking went back to the date of the original unlawful entry.
In the Shoshone case, by the Treaty of July 3, 1868 (15 Stat. 673), in an exchange of lands, the United States transferred to the Shoshone Tribe 3,054,182 acres of land in Wyoming. The United States agreed that the territory described in the treaty, now generally known as the Wind River Reservation, would be “set apart for the absolute and undisturbed use and occupancy of the Shoshone Indians * * * and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them.” It was further convenanted by the United States that no person, except a few specially enumerated, should ever be permitted to pass over, settle upon, or reside in the territory so reserved.
In 1869 a band of Arapahoes was wandering about the country looking for a home. They came upon the reservation and were permitted by the chief of the Shoshones to stay there for a short time whilej' the Government was seeking to place them elsewhere. After a few months they moved away.
*232 Later, the Commissioner of Indian Affairs endeavored to get the consent of the Sbosbones for the reentry of the Arapahoes into the Shoshone reservation, but this consent was not given.
On March 18, 1878, a band of Arapahoes was brought to the reservation of the Shoshones under military escort. The Shoshones were thus compelled to permit the settlement of the Arapahoes within their reservation. It was treated by the Government as a continuous and permanent settlement, and the Arapahoes were given a tract of land within the reservation.
It seems to us that the Shoshone case can be clearly distinguished from the case at bar, and, properly analyzed, supports the plaintiff’s contention in the instant case. In the Shoshone case the Government took the land with the full knowledge that such lands belonged to the Shoshone Tribe of Indians: It was a direct and intentional taking in 1878, notwithstanding the Departmental officials erroneously assumed at the time that the Shoshones had given consent thereto. It will be noted that in the Shoshone case the Supreme Court did not fix the date of taking as of the date of a survey, but as of the date of entry under military escort. Naturally when this land was taken in full knowledge of the rights of the Shoshone Indians it constituted, in the absence of proper consent, a legal taking of the land owned by the Shoshone Tribe, and that constituted the date of the taking rather than the later act of the Congress.
On the question of the necessity that there shall be an intentional taking, see the following cases: John Horstmann v. United States, 257 U. S. 138, 145; Tempel v. United States, 248 U. S. 121, 129, 130, 131.
In the case of Choctaw Nation v. United States, 21 C. Cls. 59, 110, the court in referring to the same boundary line involved in the instant case, stated “By the Act of 1875 (18 Stat. L., 476), the line erroneously surveyed was fixed as the permanent boundary of the State of Arkansas and the Indian country; by force of the act, land belonging to the claimant was taken for the use and benefit of the defendants * *
The court also comments on the fact that in that case the United States contended that the taking was in 1875.
*233 In the same case, 119 U. S. 1, the Supreme Court used the following language:
It is found as a fact by the Court of Claims, that, in the location of the line which was surveyed under the authority of the United States, and fixed as the permanent boundary between the State of Arkansas and the Indian country by the act of Congress of March 3, 1875, 18 Stat. 476, the government made a mistake, whereby they embraced in the territory appropriated by the United States as part of the public lands, 136,204-2/100 acres of Indian lands, the value of which, as ascertained by the Court of Claims, is $68,102. This is a just and valid claim, for which the petitioner is entitled to recover.
The defendant earnestly contends that a visible boundary, long acquiesced in, becomes the true boundary, and any loss thus occasioned gives rise to no claim for compensation. Many authorities are cited. Most of these, however, have to do with controversies between sovereign states dealing as equals, or private parties dealing as equals where the marginal strip is small.
In most of these cases the underlying reason for invoking the doctrine of ancient boundaries is the tremendous upsetting of established conditions and intervening rights that would be occasioned by correcting a boundary error.
No doubt this was the reason the Commissioner of Indian Affairs, when the employees making the survey in 1857 found that an error had been made in the original survey, directed the surveyors not to complete the true line, but to confine their activities to resurveying the old and erroneous line and re-marking it as originally marked.
This did not mean that the Commissioner of Indian Affairs did not recognize the right of the owners to the value of the lands, but he evidently realized the difficulty of adjusting the dispute by returning the lands to the proper owners. In the meantime, a part of it had been sold, settlements had been made, a great many individual rights had been acquired. It was very evident that an undertaking to move all the people that had come in, and to restore to them the value of the outlay made in good faith in purchases and improvements, would involve far more serious consequences than a simple *234 returning to the owners of the value of the lands improperly, taken.
At any rate, he did not see fit to press the matter further at that time. Undoubtedly he felt that so many difficulties were involved that it would probably take an Act of Congress to adjust the rights. After a period of years an Act of Congress was passed; viz., the Act of March 3, 1875, to which we have heretofore referred.
The fact that the Commissioner of Indian Affairs decided for the time being to stand by the original survey and the fact that Congress passed the Act of March 3,1875, ratifying the original marking did not mean that because the original boundary was to be recognized the Government did not intend to account to the rightful owners for the property wrongfully taken. The sweep of the years did not add anything to the rights of the defendant, nor take anything away from the rights of the plaintiff in respect to just compensation.
This is especially true in view of the fact that between the defendant and the plaintiff there existed a relationship similar to that of guardian and ward. The defendant had all the power; it could take such action as it saw fit. The very fact of that relationship calls for the utmost care to see that all the legal rights of the Indian tribes were protected.
The philosophy behind this relationship is nowhere better expressed than by the Supreme Court of the United States in the Net Proceeds case of The Choctaw Nation v. United States, 119 U. S. 1, 27, which relates to this same eastern boundary and to the same tract of land which forms the basis of the instant suit. We quote:
In reviewing the controversy between the parties presented by this record, it is important and necessary to consider and dispose of some preliminary questions. The first relates to the character of the parties, and the nature of the relation they sustain to each other. The ' United States is a sovereign nation, not suable in any court except by its own consent, and upon such terms and conditions as may accompany that consent, and is not subject to any municipal law. Its government is limited only by its own Constitution, and the nation is subject to no law but the law of nations. On the other *235 hand, the Choctaw Nation falls within the description in the terms of our Constitution, not of an independent state or sovereign nation, but of an Indian tribe. As such, it stands in a peculiar relation to the United States. It was capable under the terms of the Constitution of entering into treaty relations with the government of the United States, although, from the nature of the case, subject to the power and authority of the laws of the United States when Congress should choose, as it did determine in the act of March 3,1871, embodied in § 2079 of the Kevised Statutes, to exert its legislative power.
As was said by this court recently m the case of the United States v. Kagama, 118 U. S. 375, 383: “These Indian tribes are the wards of the nation; they are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the States and receive from them no protection. Because of the local ill-feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive, and by Congress, and by tms court, whenever the question has arisen.
It has accordingly been said in the case of Worcester v. Georgia, 6 Pet. 515, 582: “The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenon of the treaty, they should be considered as used only ini the latter sense. * * * How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.”
The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good *236 by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws.
The rules to be applied in the present case are those which govern public treaties, which, even in case of controversies between nations equally independent, are not to be read as rigidly as documents between private persons governed by a system of technical law, but in the light of that larger reason which constitutes the spirit of the law of nations. And it is the treaties made between the United States and the Choctaw Nation, holding such a relation, the assumption of fact and of right which they presuppose, the acts and conduct of the parties under them, which constitute the material for settling the controversies which have arisen under them.
The same philosophy applies to whatever interest the Chickasaw Nation had in this particular tract of land.
The defendant further urges that following the Net Proceeds case, which allotted to the Choctaw Nation $68,102.00 in payment for the land in question, the Chickasaw Nation contended for its part of this fund, and that subsequent to the payment of the judgment by the United States to the Choctaw Nation, the Chickasaw and Choctaw Nations by action of their respective legislative councils, duly approved by the President of the United States, agreed that the Chickasaw Nation should accept from the Choctaw Nation, and that the Choctaw Nation should pay to the Chickasaw Nation, an amount equal to one-fourth of the judgment of $68,102.00 less $1,021.53, which it was agreed was the Chickasaws’ pro rata share of the cost incurred by the Choctaw Nation in prosecuting the suit.
The plaintiff urges that such agreement is not binding on the ground that the Chickasaw and Choctaw Nations, under the law prevailing at that time, had no right to make such a treaty or agreement. However, as the warrant was never issued and the money was never paid to the Chickasaw Nation, we cannot see how the defendant is in a position to invoke this understanding as a settlement of its obligation. Brown v. Spofford, 95 U. S. 474, 477.
The defendant had the right to make the Chickasaw Nation a party to the Net Proceeds case. It did not see fit to do so. *237 The fact that it settled with the Choctaw Nation did not in any sense constitute a settlement with the Chickasaw Nation. While the Chickasaw Nation had indicated its willingness to accept a one-fourth interest in the money which the Choctaw Nation had received in payment of the judgment, since it was not actually paid, it certainly did not relieve the defendant of the obligation to settle with the Chickasaw Nation for whatever rights it had in the premises.
The plaintiff contends that the value of the lands in question in 1875 was more than 500 per acre. However, after exhaustive study the Court of Claims in the Net Proceeds case, decided January 25, 1886, found that to be the value of the lands. This finding was not disturbed by the Supreme Court in passing upon the case. The lands in the public domain were sold and offered for sale in this particular area from $1.25 per acre to as low as 12%0 per acre over a period of years.
The only additional evidence which plaintiff offered was some tax valuations and some sales of lands in this particular area during the period between 1870 and 1880. These records, however, are incomplete. They do not show the nature of the land listed, nor what improvements may have been located on any of the tracts at that time.
The valuation placed upon this property by the Court of Claims and approved by the Supreme Court was as near to a correct valuation as can be reasonably ascertained at this time. We, therefore, find that the value of the lands on March 3,1875, was $68,102.00.
Since for a long period of time the basis of settlement of rights between the Choctaws and Chickasaws in respect to the lands was three-fourths to the Choctaws and one-fourth to the Chickasaws, and since the defendant had recognized this basis of division in numerous accountings, the plaintiff is entitled to recover one-fourth of the value of the lands. Under the previous decisions of the Supreme Court just compensation for lands taken from the Indians has been construed by the court to include interest. Ordinarily interest would be calculated from the date of the legal taking of the lands, March 3, 1875. United States v. Creek Nation, and Shoshone Tribe v. United States, supra.
*238 However, the facts in this case are unusual. The plaintiff asserted no affirmative interest in this particular strip of land until after the decision in the Net Proceeds case in 1886, indeed until after the payment of the judgment in that case in 1888.
Later the Chickasaws began to claim a one-fourth interest in the proceeds of the judgment that had been rendered in favor of the Choctaws. Following considerable discussion they entered into a treaty or agreement with the Choctaws whereby they were to be paid $16,003.97 as their part, less expense of the suit, of the funds that had been recovered in that case. This treaty or agreement was approved by the President of the United States on February 19, 1906.
In view of these and other facts of this case as well as the long period that has elapsed, we find that the payment of $17,025.50 (one-fourth of the sum of $68,102.00) with interest thereon from February 19, 1906, at the rate of 5 percent per annum constitutes just compensation for the interest in the lands taken from the Chickasaws. As to the date from which interest should be calculated, see City of Ft. Worth v. McCamey, 93 Fed. (2d) 964, 968, 969, and cases cited.
Even if it were found that the Chickasaw Nation had no affirmative title to the lands in question, it undoubtedly had purchased sufficient rights in the lands to be entitled to a one-fourth interest in the proceeds of all sales and leases of land and mineral rights. In the disposition of all such proceeds since 1837 it had been allotted one-fourth. By the agreement of 1905 it was to be paid by the Choctaws a sum equal to one-fourth of the amount paid to the Choctaws in the Net Proceeds case. This agreement was approved by the President February 19,1906. The money of both tribes was on deposit in the Treasury of the United States.
Before defendant could claim exemption from liability to the Chickasaws for their interest in the proceeds of the lands which defendant had taken, it seems logical to hold that defendant would be obligated to see that their part of the moneys was actually paid to them.
Thus substantially the same result is reached whichever horn of the dilemma is chosen.
Is the defendant entitled to recover on its cross action against the Choctaw Indians?
*239 At the time the judgment in the Net Proceeds case was collected, the Choctaws were fully aware of the interest of the Chickasaws. They had sold the Chickasaws a one-fourth interest in their lands. For many years in all proceeds arising from the disposition and leasing of these lands the Chickasaws had received one-fourth.
In accordance with this custom, practice, and interest, the Choctaws had promised by the Agreement and Treaty of 1905 to pay to the Chickasaws one-fourth of the net proceeds of that judgment. The agreement to pay this amount was approved by the President of the United States.
Accordingly, therefore, defendant is entitled to recover on its cross action against the Choctaw- Nation the sum of $16,-003.97, the amount which all parties to this suit agreed should be paid by the Choctaws to the Chickasaw Nation.
Since there was no stipulation for interest on this amount, since the claim is for a part of the moneys paid to the Choctaw Nation for the taking of lands in which the Chickasaws had an interest, and because of the peculiar relationship existing between the defendant and the Choctaw Nation, and because of the delay of the defendant in seeking a return of the money from the Choctaws, we do not think this obligation for the return of funds should bear interest prior to the date of entry of judgment herein. United States v. Sanborn, 135 U. S. 271, 281. This position is all the more conclusive because of the distinctions made by the Supreme Court in the case of Goltra v. United States, decided February 3, 1941 (312 U. S. 203).
We do not think the doctrine that money voluntarily paid cannot be recovered should be applied to the instant case. Wisconsin Central Railroad Co. v. United States, 164 U. S. 190, 211, 212.
Plaintiff is entitled to recover, but the determination of the amount of the recovery and the amount of offsets, if any (See Eule 39a), is reserved for further proceedings-; and the defendant, the United States, is entitled to recover over against the Choctaw Nation the sum of $16,033.97.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.