The **CHEROKEE NATION OR TRIBE OF INDIANS IN OKLAHOMA, the Choctaw Nation and the Chickasaw Nation, Appellants,**

v.

**STATE OF OKLAHOMA et al., Appellees.**

**Nos. 9924, 9925.**

United States Court of Appeals
Tenth Circuit.

Oct. 31, 1968.

---

740

Earl Boyd Pierce, Muskogee, Okl., for appellant The Cherokee Nation. With him on the brief were Joseph Muskrat, Oklahoma City, Okl., Andrew C. Wilcoxen, Muskogee, Okl., and Jesse L. Ballard, Tulsa, Okl.

Lon Kile, Hugo, Okl., for appellants The Choctaw Nation and The Chickasaw Nation.

M. Darwin Kirk, Tulsa, Okl., for the appellees. With him on the brief were G. T. Blankenship, Atty. Gen., for the State of Oklahoma; N. A. Gibson, Oklahoma City, Okl., for Commissioners of the Land Office of the State of Oklahoma; Jay R. Bond and Ross, Holtzendorff & Bond, Oklahoma City, Okl., for Eason Oil Co.; Varley H. Taylor, Oklahoma City, Okl., for Humble Oil & Refining Co.; Robert W. Richards and S. M. Groom, Jr., Oklahoma City, Okl., for Mobil Oil Corp.; Judson S. Woodruff, McAfee, Dudley, Taft, Cates & Mark, Oklahoma City, Okl., and S. W. Wells, Tulsa, Okl., for Skelly Oil Co.; H. B. Watson, Jr., and Walker & Watson, Tulsa, Okl., for Union Oil Co. of California and Steve Gose; Frederic Dorwart and Holliman, Langholz & Runnels, Tulsa, Okl., for Lone Star Producing Co.; David O. Cordell, Eugene A. Hoefling, Riley B. Fell and Oscar L. Hasty, Tulsa, Okl., for Marathon Oil Co.; Glenn R. Davis, Boesche, McDermott & Eskridge, Tulsa, Okl., and Millard F. Carr, Denver, Colo., for Tenneco Oil Co.; Dale Hinson, Robert L. Trimble and Hudson, Keltner, Smith & Cunningham, Fort Worth, Tex., for Southland Royalty Co.; W. Douglas Weisbruch, Irving, Tex., for Lone Star Producing Co.

Roger P. Marquis, Washington, D.C., for amicus curiae the United States. With him on the brief were Clyde O. Martz, Asst. Atty. Gen., and Frank B. Friedman, Atty., Dept. of Justice.

Alpheus Varner, Poteau, Okl., for amici curiae Robert G. Carter, B. E. Cobb and Katherine Cobb Baker.

Before LEWIS, BREITENSTEIN and HICKEY, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This controversy concerns the ownership of the bed of the Arkansas River between its confluence with the Grand River [1] and the Oklahoma-Arkansas boundary. The Cherokees, Choctaws, and Chickasaws claim under deeds for vast areas executed by the United States.

1. Sometimes known as the Neosho River and as the Neosho-Grand River.

Oklahoma says that under the equal footing-implied trust doctrine it received title to the beds of navigable streams upon its admission to the Union. The trial court's decision in favor of Oklahoma was made, without an evidentiary hearing, on the pleadings and matters of which it could take judicial notice. No party contends seriously that any evidence is needed or helpful.

The Cherokees sued Oklahoma and the holders of various sand, gravel, oil, and gas leases granted by Oklahoma and covering parts of the land in dispute. The relief sought was an accounting and an injunction. Oklahoma and various of its lessees counterclaimed for a decree quieting title in Oklahoma. The Choctaws and Chickasaws were permitted to intervene and assert their claims of ownership to a portion of the riverbed.[2]

All parties agree that the stretch of the Arkansas River with which we are concerned is navigable in fact.[3] From the mouth of the Grand to the confluence with the Canadian, the Arkansas flows through an area granted to the Cherokees. From the mouth of the Canadian to the state boundary, the river divides the lands of the Cherokees, which lie to the north, from the lands of the Choctaws, which lie to the south. The Choctaws claim that their title goes to the north bank of the Arkansas and the Cherokees dispute this. We find it unnecessary to consider this controversy between the Tribes.

The Tribes assert ownership by reason of deeds from the United States covering vast, undivided areas, the perimeters of which were described by metes and bounds. The deeds did not except the beds of navigable streams. The basic argument is that, as a simple matter of conveyancing law, title to all lands within the area vested in the Tribes. An understanding of the situation requires consideration of the circumstances in which the deeds were issued.

At the time of the independence of the United States, the Tribes occupied large areas of land in the South. Westward expansion caused increasing friction between the white settlers and the Indians. Georgia and other later formed states asserted jurisdiction over the Indians and their lands. Intolerable situations arose.[4] The states ignored efforts by the United States to protect and provide for the Indians through treaty and statute. The federal government, faced with growing strife among the Indians and the states, adopted the policy of resettling the Indians on lands to the west which were not then settled by whites.

The Cherokees were first given lands near the White River in what is now the State of Arkansas.[5] Emigration was slow, and new treaties were made, providing for resettlement of all the Cherokees on land west of the Mississippi to be deeded to the Indians by the United States. In turn, the Indians surrendered their lands east of the Mississippi.[6] The Cherokees were then moved to the new lands, but the voluntariness of their

2. This is a joint claim. It is undisputed that the Choctaws have an undivided three-fourths interest and the Chickasaws an undivided one-fourth interest. See 11 Stat. 573; 11 Stat. 611; and Chickasaw Nation v. United States, 94 Ct.Cl. 215, 237. Hereinafter reference will be made only to the Choctaws.

3. In Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 86, 43 S.Ct. 60, 67 L.Ed. 140, the Supreme Court upheld a lower court finding that the head of navigation on the Arkansas was the mouth of the Grand.

4. Descriptions of the condition of the Indians are found in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25; Worcester v. State of Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483; and Choctaw Nation v. United States, 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306.

5. See Treaty of July 8, 1817, 7 Stat. 156, 158.

6. See Treaty of May 6, 1828, 7 Stat. 311; Treaty of February 14, 1833, 7 Stat. 414; and Treaty of New Echota, December 29, 1835, 7 Stat. 478.

migration, and of their consent to the treaties, is doubtful.

The story of the Choctaws is much the same. Relocation of that Tribe from areas east of the Mississippi was made pursuant to the Treaty of Doak's Stand, October 18, 1820, 7 Stat. 210, and the Treaty of Dancing Rabbit Creek, September 27, 1830, 7 Stat. 333. The Choctaws gave up their lands in the East and received lands in the West.

The relocation of the Indians was made possible by the Louisiana Purchase of 1803,[7] in which the United States obtained the major portion of the western basin of the Mississippi River with the express intent that the inhabitants of the region "shall be incorporated in the Union of the United States."[8] Prior to relocation, however, the Cherokees and Choctaws desired protection from harassment by state and territorial governments. To induce them to move across the Mississippi, the United States agreed in the Treaty of New Echota and in the Treaty of Dancing Rabbit Creek that no part of the land granted would be included in any state or territory.[9] The patents issued to the Cherokees and to the Choctaws contained no exception or reservation relating to the beds of navigable streams. The lands granted were described by their exterior boundaries.

In the years that followed the situation of the Indians deteriorated.[10] New territories were created in the West and new states admitted into the Union. A number of these states were in regions where Indian treaties provided that no state or territory should be created.[11] The existence of an extensive area which was held by the Indians and in which private property was not recognized was a serious obstacle to the creation of the State of Oklahoma.[12] In 1893, Congress created a commission to negotiate with the Cherokees, the Choctaws, and other tribes for the extinguishment of the tribal titles to land,[13] and the allotment of land to the individual members of the tribes. The result was an agreement with the Cherokees[14] and with the Choctaws[15] which nullified treaties inconsistent therewith and which provided for the allotment of the lands. These agreements were followed by the Act of April 26, 1906, 34 Stat. 137, which provided for final disposition of the affairs of the Five Civilized Tribes.[16] This Act required that lands belonging to the tribes on their dissolution shall be held by the United States in trust for the use and benefit of the Indians.[17]

Oklahoma was admitted into the Union in 1907 upon compliance with the conditions of the Enabling Act[18] which provided that Oklahoma should be so admitted "on an equal footing with the original States,"[19] and on the agree-

7. Treaty of April 30, 1803, 8 Stat. 200.

8. Id. at 202.

9. The Treaty of New Echota provided (Art. 5, 7 Stat. 478, 481) that the lands ceded "shall, in no future time without their [the Indians'] consent, be included within the territorial limits or jurisdiction of any State or Territory." The Treaty of Dancing Rabbit Creek provided (Art. IV, 7 Stat. 333, 334) that "no part of the land granted them [the Indians] shall ever be embraced in any Territory or State."

10. Stephens v. Cherokee Nation, 174 U.S. 445, 450–460, 19 S.Ct. 722, 43 L.Ed. 1041, contains an account of conditions existing in the tribal governments and mentions their corruption and irresponsibility.

11. See e. g. Treaty with the Senecas and Shawnees of July 20, 1831, 7 Stat. 351, 353; Treaty with the Shawnee of August 8, 1831, 7 Stat. 355, 357; and Treaty with the Ottaway of August 30, 1831, 7 Stat. 359, 361.

12. Choate v. Trapp, 224 U.S. 665, 667, 32 S.Ct. 565, 56 L.Ed. 941.

13. 27 Stat. 612, 645.

14. 32 Stat. 716, 727.

15. 32 Stat. 641, 656.

16. These included the Chickasaws, Creeks, and Seminoles in addition to the Cherokees and the Choctaws.

17. 34 Stat. at 148.

18. Act of June 16, 1906, 34 Stat. 267.

19. Id. at 271.

ment that it disclaim title "to all lands * * * owned or held by any Indian or Indian Tribes." [20] By statute [21] and by court decision [22] Oklahoma has consistently maintained the position that it owns the beds underlying navigable streams. The present suit which questions that ownership was brought by the Cherokees nearly sixty years after statehood.

In Pollard v. Hagan, 44 U.S. (3 How.) 212, 230, 11 L.Ed. 565, the Court held that the Constitution did not pass title of the beds of navigable waters to the United States, but reserved title to the several states. Because new states enter the Union on an equal footing with all other states, title to the beds underlying navigable waters passes to the new states.[23] Shively v. Bowlby, 152 U.S. 1, 48, 14 S.Ct. 548, 38 L.Ed. 331, establishes the power of Congress to grant land below navigable water in a territory when it is necessary "to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce · * * *, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." The decision in United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465, recognizes the rule stated in Shively v. Bowlby and adds that the United States has refrained from making such dispositions except "in exceptional circumstances" and that disposals during the territorial period "are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

The parties recognize the principles just stated except that the Indians and those who support them question the applicability of the Holt State Bank decision because of distinguishing facts. Before Minnesota became a state in 1858, the Chippewas ceded to the United States their aboriginal right of occupancy with the reservation of an area for continued occupation. Included therein was Mud Lake which the Court found to be navigable water. Later the Indians relinquished the area to the United States. The issue was whether the United States held title to the land on which Mud Lake was located. The Court held that the lands under the lake were not disposed of by the United States before Minnesota became a state and title passed to Minnesota on admission. Although Holt State Bank was not concerned with a situation, such as we have here, involving a conveyance by the United States to the Indians, that case and the one at bar each relate to the question of whether the United States had disposed of lands underlying navigable waters before statehood. We must follow the admonition in Holt State Bank that such dispositions should not be regarded as intended in the absence of a clear showing of intent.

The United States, as amicus,[24] argues that the equal footing-implied trust doctrine has no application because of the unique character of the Cherokee and Choctaw territory under the treaties and cites Atlantic and Pacific Railroad Company v. Mingus, 165 U.S. 413, 17 S.Ct. 348, 41 L.Ed. 770, as supporting authority. In that case the issue was the validity of an act forfeiting a part of a railroad land grant. A claim

---

**20.** Id. at 279.

**21.** See 64.Okl.St.Ann. § 290; 60 Okl.St. Ann. § 337.

**22.** State v. Nolegs, 40 Okl. 479, 139 P. 943; Vickery v. Yahola Sand & Gravel Co., 158 Okl. 120, 12 P.2d 881; City of Tulsa v. Commissioners of Land Office, 187 Okl. 82, 101 P.2d 246; and Lynch v. Clements (Okl.), 263 P.2d 153.

**23.** See Mumford v. Wardwell, 73 U.S. (6 Wall.) 423, 436, 18 L.Ed. 756, and Weber v. Board of Harbor Commissioners, 85 U.S. (18 Wall.) 57, 65, 21 L.Ed. 798.

**24.** The United States disclaims any pecuniary interest in the outcome of the cases and says that it submits its views because of "its nonpecuniary obligations to represent certain Indian interests."

of the railroad was that the forfeiture failed because the United States had not carried out its part of the bargain to extinguish certain Indian titles. The Court mentioned the Treaties of New Echota and Dancing Rabbit Creek and said that the extinguishment of the Indian title was for determination by Congress or by the executive officers of the federal government, or by voluntary acts of the Indians. Id. at 437–438, 17 S.Ct. 348. The Court quoted with approval the statement in United States for Use of Mackey v. Coxe, 59 U.S. (18 How.) 100, 103, 15 L.Ed. 299, that the Cherokee territory "is not a foreign, but a domestic territory—a Territory which originated under our Constitution and laws."

■ The treaties with the Indians are not in the same category with treaties with independent foreign nations. The Supreme Court early held that English possessions in America were claimed by right of discovery rather than by right of conquest and that under international law the Indians were regarded as temporary occupiers of the soil which was disposable by the Crown.[25] The title of the Crown passed to the United States and the Indian lands were subject to disposition under the Constitution and laws of the United States. The agreements with the Indians, when ratified by Congress, became statutes of the United States. When grants were made to the Indians, the area granted remained under the jurisdiction of the United States and subject to its Constitution and laws.

■ In spite of provisions in Indian agreements that no state or territory would be created in certain areas,[26] states were created in the Northwest Territory and in the area covered by the Louisiana Purchase. In the situations before us, the Cherokees and Choctaws agreed to a nullification of the

Treaties of New Echota and Dancing Rabbit Creek.[27] Oklahoma was admitted to the Union on an equal footing with the original states. From a practical standpoint, the equal footing principle must be recognized and maintained. There is no place in our federal system for a second-class state.

■ Title to the riverbed in question passed to Oklahoma on admission unless prior thereto Congress disposed of the federal title for a public purpose by an action showing a clear intent to make such divestiture. Such intent is not definitely declared in the grant. The question is whether the surrounding circumstances make that intent "very plain."[28]

■ The intent is said to be established by the agreement of the United States that no state or territory would be created in the area granted. The acceptance of this position would have widespread implications because, as we have seen, other states were created in areas covered by Indian treaties having similar provisions to those found in the Treaties of New Echota and Dancing Rabbit Creek. We believe that such provisions had to do with the exercise of political power rather than with property rights. The political aspects were changed by the Indians' acceptance of the nullification of the treaties. The property rights were unaffected by either the recognition or the nullification of the treaty provisions concerned with the creation of state or territorial governments.

The Indians point out that the ownership of the riverbed is not necessary to the exercise of control over navigation incidental to the authority of the Government under the Commerce Clause. This proves nothing. We are concerned with a property right—not with a navigational right. The recognition in the treaties of the constitutional powers of

25. See Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 595, 5 L.Ed. 681, and Martin v. Waddell, 41 U.S. (16 Pet.) 367, 409, 10 L.Ed. 997.

26. See footnote 11.

27. See footnotes 14 and 15.

28. United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465.

the United States,[29] if it has any effect at all, negatives intent to convey the riverbed.

 Pursuant to their agreements with the United States, the Indians surrendered the areas which they occupied in the South. They reason that because they gave up the beds of navigable rivers, the United States intended that they should have such riverbeds in the areas to which they were removed; and conversely they say that if they do not own the Oklahoma riverbeds, they still own the beds of the navigable rivers in the territory from which they were removed. The reasoning is unpersuasive. The Indians had an aboriginal title which was subject to the Constitution and laws of the United States. Failure to mention riverbeds does not establish an intent either to retain or relinquish title. If anything, it shows that no party had the problem in mind.

Amici Carter, et al., argue that no contemporary intent of Congress to reserve the riverbeds can be postulated because under the then existing law the concept of navigability was limited to waters affected by the rise and fall of the tides and the Arkansas was not so affected. The Supreme Court has rejected as inapplicable to this country, the English rule that the test for navigability is the ebb and flow of the tides.[30] The recognition in 1832 by Kent of the English rule[31] preceded any decision by the Supreme Court on the issue and may not be taken as authoritative or persuasive. Reliance on the January 19, 1816, act of the Missouri Territorial Legislature[32] is misplaced because it adopted the common law of England except to the extent that it was not of a "local nature" and "not repugnant to, nor inconsistent with the constitution and laws of the United States." The Supreme Court has said that the ebb and flow of the tide test is not applicable to conditions in the United States. Jones v. Soulard, 65 U.S. (24 How.) 41, 16 L.Ed. 604, deals with the ownership of accretions and is not in point.

The application of the navigability principle announced in The Daniel Ball and in Barney v. City of Keokuk, supra, to the situation presented does not violate any rule of stare decisis. We recognize the importance of stare decisis to decisions affecting property rights.[33] There is no showing that any federal court has ever applied the tidewater rule in determining the ownership of land underlying navigable water and, particularly, there is no factual basis for any claim that the Cherokees or Choctaws ever relied on that rule to their detriment.[34]

United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed. 329, is no help to the Indians. That decision recognized the dominant navigational servitude held by the United States and rejected the claim that the United States must

---

29. See Treaty of New Echota, Art. 5, 7 Stat. 478, 481, and Treaty of Dancing Rabbit Creek, Art. IV, 7 Stat. 333, 334.

30. The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999, and Barney v. City of Keokuk, 94 U.S. 324, 336, 24 L.Ed. 224. The reason is that in England all navigable rivers are affected by the tide whereas in the United States that condition is not present.

31. See Commentaries on American Law by James Kent, 2d ed., Vol. III, p. 427.

32. The pertinent area was then in the Territory of Missouri.

33. In this regard the amici Carter, et al., rely heavily on the statements in The

Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 458, 13 L.Ed. 1058, that in overruling The Steam-Boat Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358, it was not concerned with property rights. These cases dealt with admiralty jurisdiction and have no pertinence here.

34. In Shively v. Bowlby, supra, the Court applied the American rule in deciding the ownership of the Columbia River upon Oregon's entrance to the Union in 1859. In the Holt State Bank case, supra, the Court applied the same rule to the ownership of Mud Lake when Minnesota became a state in 1858.

pay compensation for land's special value as a port site. It was not concerned with the ownership of a riverbed. It does not overrule Mumford v. Wardwell, 73 U.S. (6 Wall.) 423, 436, 18 L.Ed. 756, which says that the soils underlying navigable water "were not granted by the Constitution to the United States, but were reserved to the several States." [35] We find nothing in the law as it was at the times of the treaties which can be taken as indicative of an intent by the United States to pass title to the riverbed of the Arkansas to the Indians.

The Indians seek comfort from the technical language of the treaties and grants. They attach significance to such phrases as "to the Arkansas River," "down the Arkansas," and "thence down the main channel of the Arkansas." We agree with Oklahoma that references to the Arkansas River are for the purpose of establishing reference points, monuments, or boundaries. They do not indicate an intent, much less a clear intent, to convey the riverbed. Reliance on the surveys is misplaced. The surveyors could not determine the intent of the United States. Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, is not in point. Prior to the creation of the reservation there in question, California, by an act of its legislature, had excluded the Klamath River from the navigable class and the Court said that accordingly the river was not navigable in law. Id. at 262–263, 33 S.Ct. 449.

In Moore v. United States, 9 Cir., 157 F.2d 760, cert. denied 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277, and in

United States v. Stotts, W.D.Wash., 49 F.2d 619, it was held that lands above low-water mark in tidal areas passed to Indians under treaties with the United States. In each case the court found a definite intent on the part of the United States to retain those lands and waters for the benefit of Indian fisheries and distinguished Holt State Bank, supra, on this ground. In the case before us we have no showing of any need by the Indians for the riverbed of the Arkansas and no expression of intent that it should pass to the Indians.

We recognize that an Indian treaty is to be liberally construed in favor of the Indians [36] as unlettered people understood it and as justice and reason demand when the strong assert power over those to whom they owe care and protection.[37] Another rule of construction is that in a grant by the sovereign nothing passes by implication.[38] Holt State Bank extends this rule to a situation relating to Indian lands and to the equal footing-implied trust doctrine. Although Holt State Bank did not deal with a claim presented by Indians and although the United States is not a party to this case, we believe that the rule announced in that decision must apply. It requires a clear and definite intent to convey the beds of navigable rivers which otherwise would pass to a state on admission. Such an intent is not shown by the grant of millions of acres of land which are described by perimeters. The responsibility of the United States to the new states is not less than its responsibility to the Indians.

---

35. In United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465, the Court said that "the United States early adopted and constantly has adhered to" the implied trust doctrine regarding lands under navigable waters.

36. United States v. Shoshone Tribe of Indians, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213.

37. Menominee Tribe of Indians v. United States, 391 U.S. 404, 406, 88 S.Ct. 1705,

20 L.Ed.2d 697. The Treaty of Dancing Rabbit Creek provides, Art. XVIII, 7 Stat. 333, 336, that "in the construction of this Treaty wherever well founded doubt shall arise, it shall be construed most favorably towards the Choctaws."

38. Northern Pacific Ry. Co. v. Soderberg, 188 U.S. 526, 534, 23 S.Ct. 365, 47 L.Ed. 575, and Caldwell v. United States, 250 U.S. 14, 20, 39 S.Ct. 397, 63 L.Ed. 816.

In the final analysis the claim of the Indians rests on inference and implication. Nothing in the treaties, statutes, and conveyances establishes an intent by the United States, as trustee for states to be formed, to convey away property held for the benefit of the new states. When Congress passed the statutes pursuant to the Treaties of New Echota and Dancing Rabbit Creek, the lands covered were undeveloped and virtually unknown. To say that Congress then intended to convey the riverbeds, which over a hundred years later would become valuable because of underlying mineral deposits, is to ignore realities.

In view of the disposition which we make of the case it is unnecessary to consider the jurisdiction of the court over the claim of the Choctaws against the Cherokees or the validity of that claim.

Affirmed.