The **CHEROKEE NATION, etc.**,
Plaintiffs-Appellees,

v.

The **STATE OF OKLAHOMA** et al.,
Defendants,
The **Choctaw Nation** and The **Chickasaw Nation**, Intervenors-Appellants.

The **CHEROKEE NATION, etc.**,
Plaintiffs-Appellees,

v.

The **STATE OF OKLAHOMA** et al.,
Defendants-Appellants,

The **Choctaw Nation** and The **Chickasaw Nation**, Intervenors-Appellants.

Nos. 71–1210, 71–1295.

United States Court of Appeals,
Tenth Circuit.

June 1, 1972.

Rehearings Denied June 27, 1972.

Lon Kile, Hugo, Okl., for The Choctaw Nation and The Chickasaw Nation.

S. M. Groom, Jr., and Odie Nance, Oklahoma City, Okl., for the State of Okl. and others (with them on the briefs were Larry Derryberry, Atty. Gen. of Okl., for The State of Okl.; N. A. Gibson, Midwest City, Okl., and James E. Slater, Oklahoma City, Okl., for Commissioners of the Land Office; Jay R. Bond of Ross, Holtzendorff & Bond, Oklahoma City, Okl., for Eason Oil Co.; Frederic Dorwart of Holliman, Langholz & Runnels, Tulsa, Okl., and W. Douglas Weisbruch, Legal Depart., Dallas, Tex., for Lone Star Producing Co.; Riley B. Fell and David O. Cordell, Tulsa, Okl., for Marathon Oil Company; Sam C. Oliver, Tulsa, Okl., for Skelly Oil Co.; Luther Hudson of Hudson, Keltner, Smith & Cunningham, Ft. Worth, Tex., for Southland Royalty Co.; Robert W. Richards for Mobil Oil Corp.; Varley Taylor, Oklahoma City, Okl., and Robert L. Norris, Jr., Houston, Tex., for Humble Oil & Refining Co.; Millard F. Carr, Denver, Colo., for Tenneco Oil Co.; H. B. Watson of Walker & Watson, Oklahoma City, Okl., for Tenneco Oil Co. and Union Oil Co. of Cal.; and Roy Z. Johnson, Bartlesville, Okl., for Cities Service Oil Co.).

Earl Boyd Pierce, Fort Gibson, Okl., and Andrew Wilcoxen, Muskogee, Okl., for The Cherokee Nation (with them on the brief were Paul M. Niebell, Michael S. Yaroschuk, Washington, D. C., and Joseph C. Muskrat, Chesterton, Ind.).

John D. Helm, Washington, D. C., for The United States, amicus curiae, in both cases (with him on the brief were Shiro Kashiwa, Asst. Atty. Gen. and Edmund B. Clark and Robert S. Lynch, Attys., Dept. of Justice, and Richard A. Pyle, U. S. Atty.).

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

BREITENSTEIN, Circuit Judge.

We have again the three-pronged controversy over ownership of the bed of the Arkansas River, a navigable stream, in Oklahoma. When the case was first here we affirmed the district court holding that title was in Oklahoma, Cherokee Nation v. Oklahoma, 10 Cir., 402 F.2d 739. The Supreme Court reversed sub nom. Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615. The case was remanded to the district court for further proceedings consistent with the opinion of the Supreme Court.

Cherokee Nation brought the action, claiming title to the entire bed of the stream between the Grand River and the Canadian River and to the northerly one-half of the bed between the Canadian and the state border, and asking for an accounting and injunction. Oklahoma answered praying that title be quieted in it. Various lessees of Oklahoma also answered setting forth their lease claims and denying the claim of the Cherokees. The Choctaw Nation and the Chickasaw Nation, herein referred to as the Choctaws, see 402 F.2d 739, 742, n. 2, intervened claiming ownership of the entire bed between the Canadian and the state

border, and asking that title to that portion be quieted in them. That portion of the bed between the Grand and the Canadian is in dispute only between the Cherokees and Oklahoma.

The district court interpreted the Supreme Court opinion as conclusively denying the Oklahoma claim. It held that subject to the dominant power of the United States over navigation and to possible avulsive changes, the Cherokees owned the entire bed between the Grand and the Canadian and, between the Canadian and state border, they owned that part of the bed lying north of the main channel. The Choctaws were held to own that portion of the bed lying south of the main channel between the Canadian and the state border. It required Oklahoma to account for all money received by it from its lessees and to deposit the amount thereof into the registry of the court. The lessees were to account for, and deposit into the court registry, all money held by them in suspense and owing to Oklahoma under their leases. The leases were cancelled. It appears without contest that the oil and gas leases all cover land lying between the Canadian and the state border. The money to be deposited was to be divided equally between the Cherokees and the Choctaws.

Oklahoma and its lessees have appealed in No. 71–1295 from that portion of the judgment denying their claims and ordering accounting. In these respects we affirm the district court. The Choctaws have appealed in No. 71–1210 from that portion of the judgment denying their claim to the north portion of the bed between the Canadian and the state border and requiring the payment to them of only one-half of the money to be deposited with the court. We believe that we have no jurisdiction over the controversy between the Cherokees and the Choctaws and accordingly conclude that the judgment must be reversed to the extent that it determines the conflicting claims of the two tribes.

I

Oklahoma and its lessees argue that the Supreme Court did not confirm present title to the river bed in the Indians but decided only that they received ownership under the grants and treaties of 1830 and 1835. Hence, they say that the question of present ownership is still open. We do not agree.

■ Present ownership has been at stake since the inception of the suit. The Cherokees sued for an accounting for money received under the Oklahoma leases, for future rentals or royalties, and for an injunction against interference with the use of the bed. Without present ownership, they could not be entitled to the relief sought. Oklahoma and its lessees denied the claims of the Indians. The fact that the arguments in the court of appeals and in the Supreme Court centered around the construction and effect of grants and treaties did not remove the question of present ownership. Unless present ownership was at stake, the opinions of both the court of appeals and the Supreme Court were futile, academic exercises. If the Indians had divested themselves of ownership, a determination of past ownership was valueless so far as the presented issues were concerned. Without a claim of present ownership, there was no case or controversy within the meaning of Art. III, § 2, of the United States Constitution. Federal courts decide only cases and controversies. Muskrat v. United States, 219 U.S. 346, 361, 31 S.Ct. 250, 55 L.Ed. 246. The Supreme Court does not decide "abstract, hypothetical or contingent questions." Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 284, 89 S.Ct. 518, 21 L.Ed.2d 474.

■ A fair reading of the opinions, majority, concurring, and dissenting, of the Supreme Court requires the conclusion that the Supreme Court decided present ownership. See 397 U.S. at 621, 638–639, and 643, 90 S.Ct. 1328. The mandate to the district court was for

further proceedings consistent with the Supreme Court decision. The opinion of the Court may be consulted to ascertain the intent of the mandate. In re Sanford Fork and Tool Company, 160 U.S. 247, 256, 16 S.Ct. 291, 40 L.Ed. 414. The Supreme Court decision is the law of the case. Banco Nacional de Cuba v. Farr, 2 Cir., 383 F.2d 166, 177–178 and cases there cited, cert. denied 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151. The rule that a lower court must follow the decision of a higher court at an earlier stage of the case applies to everything decided "either expressly or by necessary implication." Munro v. Post, 2 Cir., 102 F.2d 686, 688; see also The Santa Maria, 10 Wheat. 431, 442–445, 23 U.S. 431, 6 L.Ed. 359, and Briggs v. Pennsylvania Railroad Co., 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403. We believe that the question of ownership, both past and present, was decided in favor of the Indians by the Supreme Court and may not now be relitigated.

◼ If we are wrong in what we believe to be the fair import of the Supreme Court decision, consideration must be given to claims now asserted by Oklahoma and its lessees. Divestiture is claimed on the ground that the Indians received title to the bed in their sovereign capacity as a public trust for the common benefit, that sovereignty was lost prior to Oklahoma's statehood, that the bed reverted to the United States, and that title passed to Oklahoma under the equal footing doctrine upon its admission to the Union in 1907.

Loss of sovereignty is said to have occurred by reason of the Act of March 3, 1893, 27 Stat. 612, 645, creating the Dawes Commission; the following negotiations for the extinguishment of tribal titles; the Act of June 28, 1898, 30 Stat. 495, 505, providing for the allotment of Choctaw lands; the agreement with the Choctaws for land allotment and the nullification of inconsistent treaties, Act of July 1, 1902, 32 Stat. 641; a similar agreement with the Cherokees, Act of July 1, 1902, 32 Stat. 716; and the Act of April 26, 1906, 34 Stat. 137, which provides for the final disposition of the affairs of the Five Civilized Tribes.

The mentioned statutes did eliminate whatever sovereignty the Indians then had. However, we are not concerned with sovereignty, a political issue, but with land ownership. The question is not whether the Indians have sovereignty but whether the tribes are still in existence and capable of land ownership. We believe that this question is answered by the 1906 Act. Section 27 thereof provides that, upon dissolution of the tribes, lands belonging to them shall not become public lands nor the property of the United States but shall be held by the United States in trust for the Indians. 34 Stat. 148. Section 28 provides for the continuation of tribal existence and tribal government for all purposes authorized by law. Ibid.

The Supreme Court has said that "when Congress has once established a [Indian] reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." Seymour v. Superintendent, 368 U.S. 351, 359, 82 S.Ct. 424, 429, 7 L.Ed 2d 346. There has been no separation here; the tribal governments still exist; and Oklahoma was admitted to the Union in 1907 upon compliance with the Enabling Act of June 16, 1906, 34 Stat. 267, which required a disclaimer of title to all lands owned "by any Indian or Indian tribes." Ibid. at 279. We adhere to the conclusion, which was implicit in our first decision, that the Indians have not divested themselves of the land in question. The claims of Oklahoma and its lessees must be rejected.

## II

The trial court cancelled all leases given by Oklahoma to the river bed, ordered an accounting for all lease rentals, bonuses, and royalty payments and the payment of the amount so received by Oklahoma into the court registry, and held that the lessees were not entitled to the return of anything paid to Oklahoma under the leases. No problem arises over the lease cancellations because Oklahoma did not own the land and could not lease

it. Oklahoma and its lessees contend that damages should have been limited to those recoverable in a trespass action. The lessees say that they are entitled to repayment of the sums paid to Oklahoma.

The trial court pointed out that the Indians had owned the bed for about 140 years without doing anything about it, that Oklahoma for almost 63 years had acted under the belief that it owned the bed, and that, because of river meandering, natural avulsions and accretions, and the recent channelization of the river, ascertainment of the changing boundaries of the bed was difficult. The court rejected the then claim of the Choctaws that they were entitled to the value of the minerals taken. It ordered that the leases be cancelled, and that Oklahoma and its lessees account and pay into the registry all sums received as lease bonuses, rentals, and royalties.

On this appeal the Choctaws withdraw their claim to mineral value and instead join the Cherokees in supporting the actions of the trial court. Oklahoma and its lessees now take the position that, if Oklahoma title fails, the Indians can recover only those damages allowable in a trespass action, stated otherwise, the mineral value, surface damage, and loss of use. They accept the lease cancellation if Oklahoma title fails.

■ We believe that the trial court reached the fairest and best result possible in a difficult situation. The action is essentially one to quiet title and, hence, of equitable cognizance. See Caywood v. January, Okl., 455 P.2d 49, 52. Upon invocation of equitable jurisdiction the court may go beyond matters underlying that jurisdiction and give whatever relief may be necessary in the circumstances. "Only in that way can equity do complete rather than truncated justice." Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332.

Oklahoma and its lessees say that the award of the lease considerations to the Indians is contrary to controlling Oklahoma law. Without exploring whether Oklahoma law controls damages in a federal equity action, we are convinced that Oklahoma law sustains the trial court. Reliance on Bowman v. Towery, 207 Okl. 4, 248 P.2d 1030, is misplaced. That was a quiet title action in which an intervenor sought recovery of a lease bonus from one who in good faith thought he was the owner and had leased the property. The court held that the claim for the bonus could not be heard because it was a new and distinctive cause of action, not germane to the suit and not within the scope of the bill. Ibid. at 1036–1037. In the case at bar accounting has been in the action from the beginning.

Whatever persuasiveness Bowman v. Towery might once have had is nullified by the later decision in Allison v. Allen, Okl., 326 P.2d 1059. In that case a cross-petition asked for an accounting in a quiet title action. The record owner, not the real owner, gave an oil and gas lease and received a bonus. The trial court gave the real owner judgment for royalties received but denied his claim to the lease bonus. On this point the Oklahoma Supreme Court reversed saying that as to the bonus, the record owner was the constructive trustee for the real owner who was entitled thereto. Ibid. at 1062. The effort to distinguish Allison v. Allen from the case at bar on the ground that in Allison the lessor was the record owner whereas here the lessor was only the ostensible owner does not impress us. In each case the lease considerations were received by one not entitled to them.

■ The decision, now acquiesced in by the Indians, that they were not entitled to trespass damages left the court with three alternatives, (1) to permit Oklahoma to retain the lease considerations, (2) to require Oklahoma to return those considerations to the lessees, or (3) to award the lease considerations to the Indians as the true owners of the leased land. The first merits little consideration. Oklahoma received money for leasing land which it did not own. To permit it to retain such money would approve unjust enrichment con-

trary to well recognized principles of equity. See Blake Construction Co. v. American Vocational Association, Inc., 136 U.S.App.D.C. 6, 419 F.2d 308, 311, and Doing v. Riley, 5 Cir., 176 F.2d 449, 457–459. The suggestions of Oklahoma that laches of the Indians precludes their recovery does not impress us. The unexplained delay in title determination was mutual. The record contains nothing to show that any action, or nonaction, of the Indians disadvantaged Oklahoma. Oklahoma has suffered, and will suffer, no detriment other than payment to the rightful owners of the money which it wrongfully received as lessor.

In our opinion Oklahoma has no right to retain the lease considerations. The right thereto lies between the lessees and the Indians. The lessees and Oklahoma made a mutual mistake of law. The documents determinative of title were all a matter of public record. We find nothing to suggest that Oklahoma engaged in conduct which misled or prejudiced the lessees. The trial court found, and we perceive nothing in the record to dispute the finding, that the lessees "got what they bargained for." The court decree protects the lessees against accountability to the Indians for actions taken under the leases. This includes damages for trespass. · The lessees are not entitled to this protection plus return of the money which they paid for the leases.

Whatever might be the situation if we were concerned only with the respective rights of Oklahoma and its lessees, we are confronted with the fact that the lessees have had the use of the land and have paid Oklahoma, not the rightful owner, therefor. If the lessees were awarded the return of the lease considerations which they have paid to Oklahoma, they would have received the use of the land for nothing and by the decree would be protected against trespass claims by the real owners. Equity will not condone such a result. The lessees are not entitled to return of the lease considerations.

This leaves us with the third alternative, accounting to the Indians for the lease considerations. No party questions the amounts of bonuses, rentals, and royalties. There is no claim that they were either exorbitant or inadequate. For all that the record shows, they were at the going rates for such leases. We perceive no reason why the Indians should not be entitled thereto. The findings and decree of the chancellor are presumptively correct, and unless a serious mistake has been made in the consideration of the evidence or an obvious error has intervened in the application of the law, the decree shall be permitted to stand. Peoples Trust & Savings Bank v. Hubbell, 10 Cir., 102 F.2d 754, 756–757. We find no mistakes of fact or law. The decree is not clearly erroneous. We believe that it properly and satisfactorily disposes of a troublesome problem.

### III

Both the Choctaws and the Cherokees claim ownership of that portion of the bed lying northerly of the main channel between the Canadian and the state border. On the first round of the case, neither the district court, the court of appeals, nor the Supreme Court decided this issue. See 402 F.2d at 742, and 397 U.S. at 630, n. 7, 90 S.Ct. 1328. After remand, the district court held that title was in the Cherokees and the Choctaws have appealed.

The problem is the jurisdiction of the federal courts to determine a boundary dispute between Indian tribes without congressional action waiving immunity and consenting to suit. Although neither the Cherokees nor the Choctaws question jurisdiction, the existence of jurisdiction is of dominant concern to the courts, McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135, and cannot be conferred by consent, American Fire & Casualty Co. v. Finn, 341 U.S. 6, 17–18, 71 S.Ct. 534, 95 L.Ed.2d 702.

The pleadings must be considered. The Cherokees sued Oklahoma and its lessees for an accounting and injunction. The defendants denied those claims and asked

that title be quieted in them. Thereafter, the Choctaws asserted ownership in part of the bed, and asked that title be quieted in them. Although the record contains no pleading responsive to the intervention, throughout the litigation the Cherokees have contested the Choctaw claim.

We deem it unnecessary to explore the intricacies of quiet title law. Resolution of the issues requires a determination of the respective rights of the claimants to the bed. The right to damages depends on ownership. Unless ownership is determined, the court cannot divide the money derived from the accounting. The question is not resolved by the fact that the court had jurisdiction over the dispute between the Cherokees and Oklahoma. The interest of the Choctaws in part of the bed permits them to join with the Cherokees in resisting the Oklahoma claim but does not authorize them to litigate the boundary dispute.

■ Under § 27 of the 1906 Act, 34 Stat. 137, 148, the United States holds the land in trust for the Indians. The United States may not be sued without consent. United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058. Neither may an Indian tribe. Turner v. United States, 248 U.S. 354, 358, 39 S.Ct. 109, 63 L.Ed. 291; Hamilton v. Nakai, 9 Cir., 453 F.2d 152, 158–159; and Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 8 Cir., 370 F.2d 529, 531–532.

Reliance on § 18, Act of April 26, 1906, 34 Stat. 137, 144, is of no avail. That statute allows defendants to assert any claim they may have against an Indian tribe after the tribe has brought suit against them in federal court in Indian Territory. This case was brought in the United States District Court for the District of Oklahoma. In any event the Cherokees, who brought the suit, did not sue the Choctaws. By their intervention the Choctaws attempted to assert a claim against the Cherokees.

In United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888, the Supreme Court held that the United States, by filing a claim against an estate in state proceedings, did not subject itself to a binding, though not enforcible, ascertainment and allowance of a cross-claim against itself, in excess of set-off. Shaw distinguishes The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313, and subsequent decisions quoting its language. Ibid. 309 U.S. at 502, 60 S.Ct. 659. In United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512–513, 60 S.Ct. 653, 84 L.Ed. 894, the Court extended the Shaw principle to an Indian tribe against which a cross-claim had been filed.

■ Although in the case at bar the problem does not arise by way of cross-claim, the principles announced in the last cited cases apply. On the northerly half of the channel between the Canadian and the state border, we have a three-cornered fight. The Cherokees and Choctaws both resisted the claims of Oklahoma and its lessees and have prevailed on that issue. The division of the accounting proceeds is in dispute between the Cherokees, who say they are entitled to one-half, and the Choctaws, who say they are entitled to the whole amount. The issue is in the lawsuit and cannot be avoided by the use of pleading labels. The result depends on ownership of the northerly half of the bed and that depends on the boundary between the two tribes. Neither tribe may directly sue the other to determine that boundary. What cannot be done directly, from a jurisdictional standpoint, cannot be done indirectly.

■ If the tribes, or either of them, want to have the common boundary, and hence land ownership, established they must secure congressional authorization for a suit by one against the other. This is the recognized procedure. See 72 Stat. 403, authorizing a quiet title suit between the Navajos and Hopis and referred to in Hamilton v. Nakai, supra, 453 F.2d at 155 and 158–159; see also 82 Stat. 15, granting consent to sue in a boundary dispute between the Navajos and the Ute Mountain Tribe. In our

opinion the federal courts have no jurisdiction to adjudicate the conflicting claims of the Cherokees and Choctaws in the absence of congressional authorization.

## IV

The judgment is affirmed so far as it (1) denies the claims of Oklahoma and its lessees and (2) requires an accounting and payment by Oklahoma and its lessees into the registry of the court. The judgment is reversed in so far as it (1) determines the conflicting rights of the Cherokees and Choctaws and (2) requires an equal division of the accounting proceeds between them. The case is remanded for further proceedings consistent with this opinion. The attention of the parties is directed to the way in which a somewhat similar controversy involving a boundary dispute between the Navajos and members of the Ute Mountain Tribe and their respective rights to bonuses, rentals, and royalties was handled in the Act of February 14, 1968, 82 Stat. 15. In No. 71–1295 the costs are assessed against Oklahoma and its lessees. In No. 71–1210 the costs are assessed against the Choctaw Nation.