The **CHOCTAW NATION** and the Chickasaw Nation, Plaintiffs-Appellants,

v.

**STATE OF OKLAHOMA** and the Commissioners of the Land Office of the State of Oklahoma, Defendants-Appellees.

No. 73–1447.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 14, 1973.

Decided Jan. 10, 1974.

Lon Kile, Hugo, Okl. (Kile & Rabon, Hugo, Okl., on the brief), for plaintiffs-appellants.

Odie A. Nance, Asst. Atty. Gen., and R. R. Williamson, Jr., Oklahoma City, Okl. (Larry Derryberry, Atty. Gen. of Oklahoma, on the brief), for defendants-appellees.

Before LEWIS, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

The present appeal is the latest chapter in the dispute between certain Indian Tribes and the State of Oklahoma over the ownership of the bed of the Arkansas River between its confluence with the Grand River and the Oklahoma-Arkansas boundary. Brief reference to the history of this rather protracted litigation will place in focus the narrow issue presented by this appeal.

The Cherokees brought suit against Oklahoma and the holders of various sand, gravel, and oil and gas leases granted by Oklahoma and covering parts of the land here in dispute. The relief sought was an accounting and an injunction. Oklahoma and certain of its lessees counterclaimed for a decree quieting title in Oklahoma. The Choctaws and Chickasaws were permitted to intervene and assert a joint claim with the Cherokees. On trial, judgment was rendered in favor of Oklahoma, and, on appeal by the Tribes, we affirmed. Cherokee Nation or Tribe of Indians in Oklahoma v. State of Oklahoma, 402 F.2d 739 (10th Cir. 1968).

On appeal to the Supreme Court that court reversed and held that the United States had conveyed title to the bed of the Arkansas River below its junction with the Grand River within the present State of Oklahoma in the various grants it had theretofore made the several Tribes. The case was then remanded to the trial court for further proceedings. Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

On remand to the trial court a dispute first arose as to whether the Supreme Court by its opinion had decided *present* title to the river bed, or had only determined that sometime in the *past* the United States had conveyed title to the Tribes. On this particular matter the trial court held that the Supreme Court had determined present title, and declined to permit Oklahoma to relitigate the matter.

A second dispute arose on remand concerning damages. The Choctaws, on the one hand, initially contended, though they later abandoned their contention, that they were entitled to the value of the minerals taken from the river bed. The lessees, at the other end of the spectrum, themselves sought return of the rentals paid the State. The State in turn contended that damages should be

limited to those recoverable in a trespass action. The order of the trial court was that the leases should be cancelled and that Oklahoma should account for, and pay into the registry of the court, all sums received by Oklahoma as lease bonuses, rentals, and royalties, which in turn would be given the Tribes.

On appeal, we affirmed both of these particular rulings of the trial court, though we did reverse a portion of the trial court's judgment which has no bearing on the present controversy, and then remanded the case for further proceedings. Cherokee Nation v. State of Oklahoma, 461 F.2d 674 (10th Cir. 1972), cert. denied, 409 U.S. 1039, 93 S. Ct. 521, 34 L.Ed.2d 489 (1972).

On second remand, the trial court conducted further hearings and eventually approved an accounting made by the Commissioners of the Land Office of the State of Oklahoma which showed total receipts derived from the lands in question in the amount of $786,541.67. At the same time, the trial court disallowed certain offsets claimed by the Commissioners in the amount of $59,125.05, such sum representing "direct costs" and "administrative expenses." At this hearing, Oklahoma immediately paid the sum of $786,541.67 into the registry of the court and it is our understanding that such funds have been invested by the court and have been drawing interest while the present appeal was being perfected.

The present appeal relates to the refusal of the trial court to require Oklahoma to account for and pay into court the interest and income received by it from the investment of the receipts received from the leasing of the river bed land here in question. In thus disallowing such interest and income, the trial court also refused certain credits amounting to $33,442.90 claimed by Oklahoma for other administrative expense. The trial court clearly indicated that if it awarded such interest and income, it would then allow the claimed credit; but disallowed each, on the ground that under the circumstances, it would be "inequitable" to hold otherwise. The Choctaws and the Chickasaws, but not the Cherokees, now appeal the order of the trial court refusing to require Oklahoma to account for the interest and income realized by it on the investment of receipts realized from leases on the Arkansas River bed. Before considering the exact nature of the "interest" here claimed by the Choctaws and the Chickasaws, reference should first be made to certain provisions of the Oklahoma Constitution.

Section 2 of Article XI of the Oklahoma Constitution creates a so-called permanent school fund to be used for the benefit of the common schools in the state. Section 6 of that same article provides for the investment of monies placed in the permanent school fund, and, as concerns the return on such investments, section 2 specifically provides that it is *only* the income realized from the fund which is to be used for the maintenance of the common schools, and that the principal is deemed a trust fund which shall remain inviolate and never diminished, though it may be increased. Section 3 of Article XI of the Oklahoma Constitution provides that the interest and income derived from the investment of the permanent school fund monies shall be used and applied each year for the benefit of the common schools in the state.

The Commissioners, relying on official opinions of the state's attorney general, have historically treated the Arkansas River bed lands as falling in the category of undesignated public lands and accordingly the rentals derived from the leasing of such river bed land have been deemed a part of the permanent school fund and such rentals have in fact in the past been delivered by the Commissioners into the school fund, where it has been commingled with many other common school fund collections. The funds constituting the permanent school fund have, as indicated, been invested, and, pursuant to the aforesaid constitutional provisions, the income therefrom has been distributed to the common schools.

Section 3 states that such income "shall be used and applied each year" and we are advised that as a practical matter the income from the permanent school fund is distributed on a monthly basis to each county in the state on a pro rata basis based on school attendance.

As indicated, the accounting made by Oklahoma indicated that down through the years it had received total receipts in the sum of $786,541.67 from the leasing of river bed land of that portion of the Arkansas River which is the subject of this litigation. In this general regard, we are further advised that Oklahoma first began selling sand and gravel leases from the river bed of the Arkansas River shortly after Statehood in 1907, and that the practice of leasing such lands has continued to date. Such receipts were, as mentioned above, placed in the permanent school fund. They were, however, but a part of the total permanent school fund, and the funds from the various sources having been commingled, it was difficult to determine with any degree of exactitude the precise amount of income utilized from the investment of the particular receipts realized from the leasing of the Arkansas River bed. However, the figure of $212,423.83 was presented to the trial court as being an "educated guess" as to the income derived over the years from the receipts realized from the State's rental of this river bed land. There has been no challenge to this "educated guess" and accordingly the sum of $212,423.83 is the amount here in controversy.

Before considering the argument advanced here as to why the judgment of the trial court should be reversed, we would first note the true nature of the interest thus claimed. As indicated, we are not here concerned with interest *after* judgment. The State has already paid into the registry of the court the monies determined to be due the Indian Tribes, and did so immediately upon such determination, and that particular sum has as a practical matter been invested and is now drawing interest.

Rather, it is the position of the Indian Tribes that Oklahoma should be required to account for all interest and income derived from the investment of the rentals on the river bed lands, apparently from the date of the first lease of such land, years ago, to the present time.

In this court, counsel for both the Indian Tribes and the State argue the same three cases. They are: (1) Brunson v. Commissioners of Land Office, 145 Okl. 219, 292 P. 562 (1930), hereinafter referred to as *Brunson the First*; (2) Commissioners of Land Office of Oklahoma v. Brunson, 175 Okl. 101, 51 P.2d 500 (1935), hereinafter referred to as *Brunson the Second*; and (3) State ex rel. Commissioners of Land Office v. Warden, 206 Okl. 223, 242 P.2d 129 (1952). In this regard the Indian Tribes contend that *Brunson the First* and *Warden* dictate a reversal of the trial court's judgment. As concerns *Brunson the Second,* counsel suggests that the Oklahoma Supreme Court in that case misconceived and failed to follow its earlier decision in *Brunson the First* and, in any event, that its subsequent holding in *Warden* overruled, in effect if not in so many words, *Brunson the Second.*

As concerns these same three cases, Oklahoma argues that *Brunson the First* and *Warden* are inapplicable to the present controversy and that *Brunson the Second* is akin to the present controversy and supports the trial court's action disallowing recovery of interest. We are in accord with the State's analysis of these three cases. A consideration of this trilogy will indicate our thinking.

The *Brunson* cases arose out of a dispute between Oklahoma and Texas as to the ownership of the river bed of the Red River, both claiming title thereto. Before this controversy was finally resolved by the Supreme Court adversely to Oklahoma, the latter issued certain oil and gas leases to Brunson on the river bed of the Red River. These leases provided that all rentals would be held by the Commissioners of the Land Office,

and, if it should be later determined that Oklahoma did not have title, then the money so held would be refunded. The money thus received from Brunson was in fact held only briefly by the Commissioners in an escrow account and then transferred to the official state depository. After the Supreme Court's resolution of the matter, Brunson made demand upon the Commissioners to refund the rentals previously paid. The Commissioners refused, and Brunson brought suit. The trial court ruled in favor of the Commissioners, but on appeal the Oklahoma Supreme Court reversed.

In *Brunson the First*, the Oklahoma Supreme Court, in holding that Brunson was entitled to a refund of all rentals paid the State when the latter's title failed, made the following pertinent comment:

"In the case at bar, the state of Oklahoma had no title to the Red river bed and its attempted leasing thereof was null and void. The defendant commissioners received the money involved herein under an agreement to hold it pending the determination of the ownership of said river bed and to return it if Oklahoma's title failed. To say that the defendants could transfer this money to the state in violation of such agreement and not incur any obligation to repay the same under such circumstances is nothing short of saying that the money of the plaintiffs could be taken without due process of law. After Oklahoma's title failed, it became the duty of the defendant commissioners to return this money to the plaintiffs."

On remand after *Brunson the First*, the trial court entered judgment requiring the Commissioners to refund all rentals received by them from Brunson under the lease agreement. Such rentals, incidentally, had, as in the instant case, been placed in the permanent school fund. Additionally, Brunson then asked the trial court to require the Commissioners to also account for the interest and income realized from the investment of the rentals for the time when such were a part of the school fund. There, as here, the right to recovery was based on general principles of equity whereby trustees are required to account to the beneficiary for all profits acquired out of, or by reason of, the trust estate. The trial court granted a peremptory writ of mandamus requiring the Commissioners to pay Brunson the sum of $9,500, said sum representing the income realized from the investment of the lease rentals. In *Brunson the Second,* the, Oklahoma Supreme Court reversed this ruling of its trial court.

In *Brunson the Second*, as here, the provisions of sections 2 and 3 of Article XI of the Oklahoma Constitution were brought into play. There, as here, the so-called interest and income realized from the investment of the monies in the permanent school fund had periodically been distributed to the common schools of the state pursuant to constitutional provision and had in turn then been spent by the schools. Hence, there remained no corpus, as concerns income monies, against which Brunson could proceed. Accordingly, the Oklahoma Supreme Court, after rejecting other possible grounds for reversal, reversed on the narrow ground that Brunson had failed to prove "the existence of any sum of money representing interest on said trust fund." In thus holding, the Oklahoma Supreme Court further observed as follows:

"The difficulty in the case at bar is the application of the rule to the facts. Herein there is no balance remaining intact equal to or greater than the alleged accumulations on the trust fund. The interest, if any was ever paid upon the loan of this money, which in fact, but by error of law, became a part of the permanent school fund, has long since lost its identity and has been expended. The interest, if any was ever derived, is not similarly situated with the trust fund itself. The permanent school fund, as the designation indicates, was intended to be permanent. It may not be

exhausted for current expense purposes. If funds wrongfully become a part of it, they may rightfully be extracted and recovered, but accruals thereon are expendable and by law they are required to be disbursed. There is no presumption of the existence of the fund which is sought to be secured by warrants to be drawn under the authority of the writ issued below."

In *Warden,* the Commissioners had invested monies from the permanent school fund in a first mortgage on a tract of land consisting of some 107 acres. The Commissioners foreclosed on this mortgage, and while the tract was thereafter in their possession, the Commissioners received rentals from several oil and gas leases which they granted on the property in question. These oil and gas leases were entered into with the approval of the court in which the foreclosure proceedings were still pending, such approval being on the condition the proceeds from such leases be held subject to order of the court. Later, the foreclosure proceedings were set aside and judgment was subsequently entered in favor of the mortgagor and against the Commissioners for the rentals received by the Commissioners when they were in possession, such judgment providing for "interest thereon at 6% per annum from said date until paid." The Commissioners immediately paid a portion, but not all, of this judgment and later appealed the unpaid portion of the judgment as well as the award of interest thereon. On appeal, the Oklahoma Supreme Court affirmed. In affirming, that court held that the very narrow question was whether a statute providing for interest at the rate of 6% per annum on a judgment in a court of record from and after its date applied to the State when the latter is "voluntarily" within the jurisdiction of the court. The court answered the question in the affirmative.

As indicated, the position of the Indian Tribes in this court is that *Brunson the First* and *Warden* require reversal. We disagree, as such is not our reading of those cases. In *Brunson the First,* the court was concerned only with the rentals and not with the income realized from the investment of the rentals while the latter were in the possession of the State. In *Warden,* the court was concerned with the State's liability for statutory interest *after* judgment had been rendered against it in a proceeding which the State itself had instituted. Neither *Brunson the First* nor *Warden* is the present case. We agree with the State that *Brunson the Second* is more akin to the present case, and the trial court's refusal in the instant case to require the State to account to the Indian Tribes for income realized from the investment of the rentals would seem to us to be in accord with the reasoning of *Brunson the Second.* In short, Oklahoma law, as we view it, does not dictate a reversal, and, on the contrary, the trial court's disallowing income realized from the investment of the rentals finds support in Oklahoma law.

The Indian Tribes, though relying primarily on *Brunson the First* and *Warden* for reversal, also take aim at the trial court's statement that "in the particular circumstances of this case it would be inequitable" to permit the Tribes to recover interest and income realized through the years from investment of lease rentals. The Tribes, citing no authority, suggest that it was inequitable to disallow such interest. We disagree. The problem faced by the trial court in the instant case is about the same as that faced by the court in *Brunson the Second,* namely, the monies for which an accounting was sought were no longer in existence, having been expended by the State pursuant to constitutional mandate. Facing the realities of the situation, then, the trial court here disallowed recovery of such interest and income and at the same time disallowed credit for administrative expense in connection therewith. Under the circumstances of this case we cannot in good conscience say that the trial court's concept of what was "doing equity" between the parties was erroneous. In

this regard, we would refer briefly to our second opinion in this controversy, Cherokee Nation v. State of Oklahoma, 461 F.2d 674 (10th Cir. 1972).

The trial court on first remand had the question of selecting the proper manner in which an accounting should be made. It ultimately determined that the State should account for all sums received as lease bonuses, rentals, and royalties. In rejecting the claim of the Choctaws that they were entitled to the value of the minerals taken from the river bed down through the years, the trial court noted that the Tribes had owned the river bed for some 140 years without doing anything about it, and that Oklahoma for almost 63 years had acted in good faith under the belief that it owned the bed.

On second appeal to this court, we upheld the trial court's selection of what under the circumstances it deemed to be the proper manner and extent of the accounting to be made by the State, i. e., a turnover of rentals received by Oklahoma to the Tribes. In thus affirming, we stated that the trial court had reached the fairest and best result possible in a difficult situation, and observed that in an equitable proceeding, such as this, the trial court should give "whatever relief may be necessary under the circumstances." So, in our second opinion in this matter, we declined to hold that the trial court's determination as to how damages would be ascertained was inequitable under the circumstances there presented and, on the contrary, we believed its disposition of the matter to be fair and proper. We concluded thereby holding that the trial court's choice as to how damages should be determined was not clearly erroneous and its resolution of the matter properly and satisfactorily disposed of a troublesome problem. In that case we then went on to say that "without exploring whether Oklahoma law controls damages in a federal equity action," we were at the same time convinced that the Oklahoma law on the subject also sustained the trial court's choice as to measure of damage.

So, too, in the instant case, we believe the trial court's action disallowing interest under all the circumstances was equitable, and not clearly erroneous, and at the same time we believe its action to be in accord with the Oklahoma law on the subject.

Judgment affirmed.